**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| BIG OAK FARMS, INC., et. al., | ) | |
| On behalf of themselves and all others | ) | |
| similarly situated, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | No: 1:11-CV-00275-NBF |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION
TO DISMISS FOR FAILURE TO STATE A CLAIM**

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ............................................................................................... 1

II.     FACTS ............................................................................................................... 3

III.    ARGUMENT ..................................................................................................... 6

      A.      The Court Must Accept Plaintiffs' Facts and Disregard
           Defendant's Alternative Narrative, Particularly in this "Fact-
           Intensive" Takings Case .............................................................................. 6

      B.      The Government's Intentional Flooding of Plaintiffs' Property
           Constitutes a Taking .................................................................................... 7

           1.      The Government's Intentional Destruction of Real Property
                  for Public Use is at the Core of Takings Jurisprudence ................. 7

           2.      Defendant's Proffered Rule that No Single Flood May
                  Constitute a Taking Contravenes Law and Common Sense ........ 11

           3.      Cases Addressing Floodway Construction and
                  Contemplated Destruction Support Plaintiffs' View of
                  Takings Jurisprudence ................................................................. 15

           4.      Although Unnecessary, Plaintiffs Have Alleged a
                  "Permanent Liability to Intermittent but Inevitably
                  Recurring Overflows." ................................................................. 18

      C.      Defendant Relies on An Alternative Factual Narrative That Is Not
           Properly Before the Court and Conflicts with the Amended
           Complaint's Allegations ............................................................................ 21

           1.      This Court Must Not Consider Defendant's Proffered Facts
                  from Cases and Letters Not Mentioned in the Amended
                  Complaint ..................................................................................... 21

           2.      Defendant's Proffered Facts Are Plainly Inconsistent with
                  the Facts As Pled ......................................................................... 24

      D.      Plaintiffs Sufficiently Alleged That Easements Owned by the
           United States Were Insufficient to Allow the Destruction of the
           Levee on May 2, 2011 ............................................................................... 27

IV.     CONCLUSION ................................................................................................ 29

# TABLE OF AUTHORITIES

**Page(s)**

CASES

Adams v. United States,
   391 F.3d 1212 (Fed. Cir. 2004)..................................................................................7

Ark. Game & Fish Comm'n v. United States,
   637 F.3d 1366 (Fed. Cir. 2011)................................................................................14

B Amusement Co. v. United States,
   180 F. Supp. 386 (Ct. Cl. 1960)........................................................................14, 15

Banner v. United States,
   238 F.3d 1348 (Fed. Cir. 2001)................................................................................22

Bell Atl. Corp. v. Twombly,
   550 U.S. 544 (2007)...................................................................................................6

Berenholz v. United States,
   1 Cl. Ct. 620 (1982) ..................................................................................................8

In re Burlington Coat Factory Sec. Litig.,
   114 F.3d 1410 (3d Cir. 1997)...................................................................................22

Chambers v. Time Warner, Inc.,
282 F.3d 147 (2d Cir. 2002)................................................................................7, 23

Columbia Basin Orchard v. United States,
   132 F. Supp. 707 (Ct. Cl. 1955).................................................................................8

Cooper v. United States,
   827 F.2d 762 (Fed. Cir. 1987)..................................................................................20

Cortec Indus.,Inc. v. Sum Holding L.P.,
   949 F.2d 42 (2d Cir. 1991).....................................................................................7, 9

Cosmas v. Hassett,
   886 F.2d 8 (2d Cir. 1989) ..........................................................................................7

Danforth v. United States,
   105 F.2d 318 (8th Cir. 1939) ........................................................................2, 15, 16

Danforth v. United States,
   308 U.S. 271 (1939)......................................................................................2, 15, 16

*Fromme v. United States*,
  412 F.2d 1192 (Ct. Cl. 1969) .............................................................................14

*Grider v. Tingle*,
  325 S.W.3d 437 (Mo. Ct. App. 2010) ...................................................................29

*Hansen v. United States*,
  65 Fed. Cl. 76 (2005) ................................................................................. *passim*

*Heigert v. Londell Manor, Inc.*,
  834 S.W.2d 858 (Mo. Ct. App. 1992) ...................................................................28

*Int'l Audiotext Network, Inc. v. Am. Telephone and Telegraph Co.*,
  62 F.3d 69 (2d Cir. 1995) ....................................................................................22

*Matthews v. United States*,
  113 F.2d 452 (8th Cir. 1940) ...............................................................................17

*Matthews v. United States*,
  87 Ct. Cl. 662 (1938) ................................................................................ 2, 16-17

*May v. United States*,
  80 Fed. Cl. 442 (2008) ...........................................................................................6

*Mays v. TVA*,
  699 F. Supp. 2d 991 (E.D. Tenn. 2010) ...........................................................9, 10

*Montana v. United States*,
  440 U.S. 147 (1979)..............................................................................................21

*National By-Products, Inc. v. United States*,
  405 F.2d 1256 (Ct. Cl. 1969) ...............................................................................15

*North Counties Hydro-Electric Co. v. United States*,
  70 F. Supp. 900 (Ct. Cl. 1947) .............................................................................10

*Phillips v. Wash. Legal Found.*,
  524 U.S. 156 (1998)........................................................................................ 27-28

*Portsmouth Harbor Land & Hotel Co. v. United States*,
  260 U.S. 327 (1922)...............................................................................10, 13, 15

*Pumpelly v. Green Bay Co.*,
  80 U.S. 166 (1871)..........................................................................................20, 25

*Ridge Line, Inc. v. United States*,
  346 F.3d 1346 (Fed. Cir. 2003)...................................................................... *passim*

iii

*Sanguinetti v. United States*,
  264 U.S. 146 (1924)...............................................................................................14

*Selva & Sons, Inc. v. Nina Footwear, Inc.*,
  705 F.2d 1316 (Fed. Cir. 1983)................................................................................7

*State Farm Mut. Auto. Ins. Co. v. Carter*,
  2008 U.S. Dist. LEXIS 108050 (W.D. Mich. Oct. 28, 2008)...................................7

*Stop the Beach Renourishment, Inc. v. Fla. Dep't of Envtl. Prot.*,
  ____ U.S. ___, 130 S. Ct. 2592 (2010)..................................................................27

*Story v. Marsh*,
  732 F.2d 1375 (8th Cir. 1984) .................................................................17, 18, 24

*United States v. Cress*,
  243 U.S. 316 (1917)......................................................................................10, 19, 20

*United States v. Lynah*,
  188 U.S. 445 (1903)..................................................................................................18

*United States v. Sponenbarger*,
  308 U.S. 256 (1939)..........................................................................................16, 23

*Waltner v. United States*,
  98 Fed. Cl. 737 (2011) ..............................................................................................6

*Yamagiwa v. City of Half Moon Bay*,
  523 F. Supp. 2d 1036 (N.D. Cal. 2007) .................................................................10

**OTHER AUTHORITIES**

Echeverria, John D. & Sharon Dennis, The Takings Issue and te Due Process
  Clause: A Way Out of A Doctrinal Confusion,
  17 Vt. L. Rev. 695 (1993) .......................................................................................11

Hart, John F., Land Use Law in the Early Republic and the Original Meaning of
  the Takings Clause,
  94 Nw. U. L. Rev. 1099 (2000) ...............................................................................11

Krotoszynski, Jr., Ronald J., Expropriatary Intent: Defining the Proper Boundaries
  of Substantive Due Process and the Takings Clause,
  80 N.C. L. Rev. 713 (2002) ...............................................................................10-11

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| BIG OAK FARMS, INC., et. al., | ) | |
| On behalf of themselves and all others | ) | |
| similarly situated, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | No: 1:11-CV-00275-NBF |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION
TO DISMISS FOR FAILURE TO STATE A CLAIM**

## I.  INTRODUCTION

This case involves the United States' intentional flooding and destruction of the property of dozens of American farmers and their families.  In its Motion to Dismiss, Defendant entirely misstates the legal standard applicable to takings claims under the Fifth Amendment and improperly attempts to import and rely upon factual findings from unrelated cases and extraneous documents that purportedly contradict the allegations in Plaintiffs' Amended Complaint.

The fundamental error underlying the United States' entire motion is its failure to recognize the legal effect of Plaintiffs' central allegation – anticipated to be uncontroverted in this litigation – that the U.S. Army Corps of Engineers *intentionally and purposefully* flooded Plaintiffs' property in order to protect the private land of others in and around Cairo, Illinois.  Where the United States intentionally floods, destroys, or otherwise purposefully causes substantial harm to property, the Federal Circuit has held

that a takings claim is established.  Virtually all of the cases cited by Defendant involve situations where the government *inadvertently* flooded private lands during the course of construction projects – cases where courts have been forced to draw a fine line to distinguish the point at which intent or foreseeability manifests a mere incidental tort as a taking.  Defendant's cases simply do not apply to this matter.

Defendant also wrongly argues that a trio of cases, *Danforth v. United States*, 105 F.2d 318 (8th Cir. 1939), *Matthews v. United States*, 87 Ct. Cl. 662 (1938), and *Danforth v. United States*, 308 U.S. 271 (1939), establish a general rule that the United States is not liable to owners of land for operation of the Birds Point-New Madrid Floodway. Defendant badly misreads those cases, which involved claims that the mere *construction* of the Floodway enacted a taking and very fact-specific determinations about the degree to which the specific parcels at issue were subject to natural flooding.  In fact, cases discussing the Floodway *support* that the government needs to obtain flowage easements over affected land prior to *operating* the Floodway.

It has always been well understood that the United States needed to acquire easements over land affected by the operation of the Floodway.  The 1928 and 1965 Flood Control Acts ordered the Army Corps of Engineers to obtain easements over potentially affected property in floodways across the country.  The resulting massive exercise of eminent domain wound its way through federal courts for decades. Defendant's argument that damages flowing from the operation of the Floodway cannot constitute a taking would have rendered unnecessary the acquisition of thousands of easements all across the country throughout the twentieth century.  Adoption of Defendant's radical position would not only be at odds with decades of precedent, but

inconsistent with the long-settled expectations of the U.S. Congress and hundreds of landowners across the country living in floodways.

Defendant's motion also imports and relies upon purported facts from documents not cited or discussed anywhere in the Amended Complaint and from cases that did not involve Plaintiffs in an attempt to undermine Plaintiffs' allegations.   There is no accompanying motion for judicial notice or collateral estoppel, and any such motion would be improper and meritless.   Defendant's attempt to "backdoor" these disputed facts into the record on their motion to dismiss is impermissible.   The contrary factual narrative put forth by the government is at odds with the explicit allegations in the Amended Complaint, which must be accepted as true and be the basis for any dismissal at this stage of the proceeding.

Plaintiffs have alleged straightforward takings claims that do not approach the boundaries of Constitutional law.   The case involves a plainly intentional government act that caused substantial damage to recognized property rights.   There are numerous fact-bound inquiries implicit in the case, including the existence and scope of various easements and the nature of damages to various parcels of land, which are not capable of resolution in a motion to dismiss.   Defendant's motion must be denied.

## II.    FACTS

On May 2, 2011, the United States Army Corps of Engineers ("Corps") deliberately destroyed with explosives large swaths of the levee which historically and ordinarily protected Plaintiffs' land from flood waters of the Mississippi River, inundating Plaintiffs' land with water, sand, and gravel.   Amended Class Action Complaint, July 11, 2011 ("Am. Compl.") ¶ 1, 51-52.   A wall of water 15 feet high crashed through homes, farms, businesses, and infrastructure, devastating and destroying

everything in its wake.  *Id.* ¶ 51.  The flood scoured large sections of land, leaving deep blue holes and crevasses on formerly arable cropland.  *Id.* ¶ 53.  Top soil was largely washed away or degraded.  *Id.*  This damage to the land is permanent and negatively impacts or destroys the land's arability and substantially diminishes its value.  *Id.*

Large deposits of sand and gravel remain on the land and have filled drainage ditches, rendering them ineffective.  *Id.* ¶ 52.  As a direct result of this inundation, Plaintiffs' land has been subjected to intermittent and recurring flooding from low-level rain, storm, and other events that would not have caused flooding in the natural course absent the inundation.  *Id.*

The Corps' flooding of Plaintiffs' land was done pursuant to an established and permanent plan legislated by the United States government with the express and specific intent to sacrifice Plaintiffs' land to superimposed water, sand, and gravel in order to derive the public benefit of diverting high water away from other properties in and around Cairo, Illinois.  *Id.* ¶ 35.

In 1927, the Mississippi River Commission submitted a flood control plan to the Corps, which recommended rising and strengthening already-existing levees, including a 70.4 foot levee on the Cairo gage to protect the then-prosperous city of Cairo, Illinois.  *Id.* ¶ 35.  Deeming the Commission's plan too expensive, the Corps rejected it in favor of its own plan, which created the Birds Point-New Madrid Floodway ("Floodway"), where Plaintiffs' land is located.  *Id.* ¶ 36.

The Corps' plan provided for the building of a "setback" levee between three and ten miles west of the existing "frontline" (or riverside) levee and *lowering* eleven miles of the frontline levee by 3.5 feet to correspond with a stage of 55 feet on the Cairo gage.  *Id.*

The plan also permitted the Corps, at its discretion, to breach the frontline levee with explosives at the degraded, or "upper fuse plug," section.  The Floodway was specifically designed to divert and contain flood waters of the Mississippi River to and in the Floodway, providing for an estimated 7 feet of stage lowering in the vicinity of Cairo, Illinois.  *Id.* ¶ 34.  In other words, Plaintiffs' land, pursuant to government edict, would now be subject to greater and more frequent floods than it had historically endured in order to reduce flood stages elsewhere.  *Id.* ¶ 37.

There is no question that the specific intent of the Corps in creating the Floodway, and of the United States in codifying it in the Flood Control Acts of 1928 and 1965, was to "deliberately turn[] floodwaters upon the homes and property of people . . ." to avoid flooding in other areas.  *Id.* ¶ 41.  The legislation acknowledged the government's servitude on Plaintiffs' land, requiring it to compensate landowners who would be subjected "to additional destructive floodwaters that will pass by reason of diversion" from the Mississippi River.  *Id.* ¶ 38.  Pursuant to this directive, the United States, in the 1930s and between 1968 and 1974, obtained easements over approximately 80% of the Floodway at an average price of $17 an acre, leaving the United States with no flowage easements whatsoever over approximately 20% of the Floodway.  *Id.* ¶ 40.

The Corps substantially modified the Floodway's operating plan in the 1980s, permitting it to crevasse the frontline levee by explosion in several additional locations, two points along the upper fuse plug, one point along the lower fuse plug, a second degraded section, and one point along the midsection of the frontline levee.  *Id.* ¶ 45.  The government's easements were not broad enough to cover this modified plan, and the

government failed to seek or obtain new or modified easements that would cover execution of this or any subsequent version of the operation plan.  *Id.* ¶ 48.

On May 2, 2011, the Corps detonated the frontline levee in multiple locations pursuant to the most recent iteration of the Floodway operation plan.  *Id.* ¶ 51.  It intentionally destroyed arable land, crops, roads, bridges, drainage systems, farm operations and equipment, and 90 residences.  *Id.* ¶ 53-60.  This damage is permanent in nature and would not have occurred in the natural course absent the Corps' detonation of the levee.  *Id.* ¶ 52.  The destruction, damage, and devaluation of Plaintiffs' land are greater than they would have been under previous operation plans that imposed greater limitations on where the frontline levee could be breached.  *Id.* ¶ 63.

## III.   ARGUMENT

### A.   The Court Must Accept Plaintiffs' Facts and Disregard Defendant's Alternative Narrative, Particularly in this "Fact-Intensive" Takings Case.

In considering a Rule 12(b)(6) motion, the Court must construe the Amended Complaint in the light most favorable to Plaintiffs and accept as true the facts as they have pled them.  *Waltner v. United States*, 98 Fed. Cl. 737, 762 (2011).  Defendant's motion must be denied if Plaintiffs plead factual allegations that are "enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007).  In this regard, *Twombly* did not change the rule that "[I]n order to state a claim for a taking, plaintiff must allege action attributable to the United States" that amounts to "physical invasion of or physical damage to a claimant's property" *May v. United States*, 80 Fed. Cl. 442, 445-447 (2008).  This Court has noted that "special care" is required in addressing summary judgment, let alone motions to dismiss, in the takings

context, and courts should avoid "precipitous grants" of motions in these cases "due to their 'fact-intensive' nature." *Hansen v. United States*, 65 Fed. Cl. 76, 94 (2005).

Moreover, "a Rule 12(b)(6) motion challenges the facts alleged on the face of the complaint." *Cortec Indus.,Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991). Thus, "the district court must limit itself to a consideration of the facts alleged on the face of the complaint, and to any documents attached as exhibits or incorporated by reference." *Cosmas v. Hassett*, 886 F.2d 8, 13 (2d Cir. 1989) (citation omitted). *See Selva & Sons, Inc. v. Nina Footwear, Inc.*, 705 F.2d 1316, 1322 (Fed. Cir. 1983) (vacating decision on motion to dismiss where "matters outside the pleadings" were considered "so as to automatically convert it to one for summary judgment"). The Court must disregard facts proffered by Defendant in a motion to dismiss. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 154 (2d Cir. 2002) (error for court to consider on motion to dismiss certain agreements not relied on by plaintiff in drafting complaint); *State Farm Mut. Auto. Ins. Co. v. Carter,* 2008 U.S. Dist. LEXIS 108050, at *23 (W.D. Mich. Oct. 28, 2008) ("[i]t is not proper to assume facts that a plaintiff has not plead when the plaintiff is opposing a Rule 12(b)(6) motion.") (citation omitted).

**B.      The Government's Intentional Flooding of Plaintiffs' Property Constitutes a Taking.**

**1.      The Government's Intentional Destruction of Real Property for Public Use is at the Core of Takings Jurisprudence.**

"A claimant under the Takings Clause must show that the government, by some specific action, took a private property interest for a public use without just compensation." *Adams v. United States*, 391 F.3d 1212, 1218 (Fed. Cir. 2004). The Federal Circuit has distilled takings jurisprudence into a two-prong test. *See Ridge Line, Inc. v. United States*, 346 F.3d 1346 (Fed. Cir. 2003). Under this test, plaintiffs state a

valid takings claim if they allege (1) that the government intended to invade their property *or* the property invasion is the direct, natural, or probable consequence of government action; and (2) that the invasion caused substantial harm. *Id.* at 1355-56. "The most notable facet of [the first prong] is . . . that the individual sub-parts (intent *or* causation) are each sufficient grounds upon which to predicate a takings claim. Provided that one of the two sub-parts is demonstrated, there is no requirement that the other also be satisfied." *Hansen*, 65 Fed. Cl. at 117 (emphasis in original).

Plaintiffs easily meet this test. In long-standing law and policy, the United States has affirmatively expressed the intent to sacrifice, as often as need be, Plaintiffs' land for the benefit of other land in and around Cairo, Illinois. Am. Compl. ¶ 34-50. The government recognized that this plan, once activated, appropriated property interests in Plaintiffs' land. Therefore, it expended time and resources to acquire easements over approximately 80% of the Floodway in the 1930s and again between 1968 and 1974. *Id.* ¶ 40, 43. In accordance with this permanent and established plan, on May 2, 2011, Defendant deliberately destroyed with explosives large sections of the frontline levee with the express intent of diverting fifteen feet of water and accompanying sand and gravel to Plaintiffs' land. *Id.* ¶ 51. As a direct, natural, and probable result of diverting the water, sand, and gravel to Plaintiffs' property, drainage ditches within the Floodway have been filled and rendered useless, subjecting Plaintiffs' farmland to frequent and recurring flooding. *Id.* ¶ 52. Plaintiffs' allegations support the government's specific intent to invade Plaintiffs' property, and that the invasion was the "direct, natural or probable result of an authorized activity" not the "consequential injury inflicted by the action." *Columbia Basin Orchard v. United States*, 132 F. Supp. 707, 709 (Ct. Cl. 1955);

*see also Berenholz v. United States*, 1 Cl. Ct. 620, 627-628 (1982) (same).   Plaintiffs satisfy both elements of the first prong of the *Ridge Line* test, even though they need only show one to state a takings claim.  *See Hansen*, 65 Fed. Cl. at 117.

Plaintiffs also satisfy the substantial harm requirement of the *Ridge Line* test.  *See Ridge Line*, 346 F.3d at 1356 (allegation of invasion of property "that appropriate[s] a benefit to the government at the expense of the property owner, or at least preempt[s] the owner's right to enjoy his property for an extended period of time" supports a valid takings claim).  Plaintiffs amply describe the devastation they suffered as a result of the government's intentional flooding of their land, including destruction of their homes, farms, businesses, and infrastructure; the erosion and degradation of top soil on their farmland that negatively and permanently impacted or destroyed their farmlands' arability; the large deposits of sand and gravel on their land filling drainage ditches and rendering them ineffective; and the intermittent and recurring flooding from low-level rains that would not normally have occurred absent the inundation that resulted from Defendant's action.  *See* Am. Compl. ¶¶ 51-64.  *See Mays v. TVA*, 699 F. Supp. 2d 991, 1027 (E.D. Tenn. 2010) (allegations of government's interference with landowners' use of their properties for an indefinite period are not "threadbare recitals of the elements of a cause of action but are allegations of facts that may support a plausible claim to relief.").  Defendant does not "challenge the[se] facts [as they are] alleged on the face of the complaint," *Cortec Industries,* 949 F.2d at 47, let alone dispute whether the magnitude of the harm alleged rises to the level required under *Ridge Line*.

The harm that Plaintiffs plead in this case is comparable to or more extensive than harm found to give rise to valid takings claims in other cases.  *See, e.g. Mays*, 699 F.

Supp. at 1027 (allegations that toxic chemicals from a coal ash spill interfered with plaintiffs use and enjoyment of their properties supported a plausible taking claim); *Yamagiwa v. City of Half Moon Bay*, 523 F. Supp. 2d 1036, 1099 (N.D. Cal. 2007) (post-trial findings of fact and conclusions of law that a city project that transformed the topography of private land in such a way that preempted the owner's right to use it for its intended purpose established the substantial injury prong of the *Ridge Line* test); *Hansen*, 65 Fed. Cl. at 122 (denying defendant's summary judgment motion where two wells on plaintiff's property tested positive for chemical contamination).  *Cf. United States v. Cress*, 243 U.S. 316 (1917) (depreciation of value of land by one-half constitutes taking); *Portsmouth Harbor Land & Hotel Co. v. United States*, 260 U.S. 327 (1922) (firing guns across land so as to scare its occupants can constitute a taking).  Plaintiffs are currently and for the foreseeable future without the ability to use their land as they usually and customarily have used it.  These allegations are sufficient to state a valid takings claim. *See North Counties Hydro-Electric Co. v. United States*, 70 F. Supp. 900, 903 (Ct. Cl. 1947) (A taking is established when a plaintiff shows a "subjection of the land for a more or less definite time to use inconsistent with the rights of the owner.").

Some commentators have leveled criticism at the developing takings jurisprudence, arguing that the modern concept of "regulatory takings" represents an unwarranted expansion of the original meaning of the Fifth Amendment clause.  Even those commentators, however, uniformly recognize that intentional acts to expropriate land for public use, as in the case of intentionally flooding a property owner's land to protect downstream interests, fall within the core historical meaning of a "taking" and are not controversial.  *See, e.g.,* Ronald J. Krotoszynski, Jr., Expropriatary Intent: Defining

the Proper Boundaries of Substantive Due Process and the Takings Clause, 80 N.C. L. Rev. 713, 719-720, 734-736 (2002); John F. Hart, Land Use Law in the Early Republic and the Original Meaning of the Takings Clause, 94 Nw. U. L. Rev. 1099, 1133-1135 (2000); John D. Echeverria & Sharon Dennis, The Takings Issue and the Due Process Clause:  A Way Out of a Doctrinal Confusion, 17 Vt. L. Rev. 695, 717 (1993); *Cf.* Hart, *supra*, 94 Nw. U. L. Rev. at 1116-1119, 11132-33 (flooding of land was specifically and squarely within the ambit of the framers original understanding of a "taking").  Plaintiffs' claims are not merely valid under a broad modern conception of the Fifth Amendment, but derive from actions that have been understood for centuries to constitute a taking.

**2.    Defendant's Proffered Rule that No Single Flood May Constitute a Taking Contravenes Law and Common Sense.**

Throughout its entire brief, Defendant fails to even articulate, let alone apply the test for what constitutes a taking under *Ridge Line*.  Instead, Defendant divines a purported bright-line rule that a single flood event may not constitute a taking under any circumstances.  Defendant's Motion to Dismiss, Sept. 9, 2011 ("Def's Br.") at 6-7.  This categorical "first flood exception" is contrary to takings jurisprudence and common sense.[1]  It defies logic that, no matter how deliberate and destructive an action may be, the government escapes liability if it limits itself to one invasion.  Applying that rule to other contexts, the United States would be held blameless under takings law if it intentionally dropped a bomb to annihilate private property, because it only dropped one

---

[1]  It is unclear how Defendant's proposed rule would operate in the context of a property in a federally-designated floodway over which the government had never purchased an applicable flowage easement.  Presumably, Defendant is arguing that the first flood is not a taking, but subsequent floods would be.  Thus, whether landowners could recover for losses would depend upon whether they were injured during the first operation of the floodway versus subsequent operations.  Defendant never explains how or why this arbitrary result flows from language of the Takings Clause.

bomb on a single occasion. The law does not pose such an obstacle or perpetrate such an inequity on victims of the government's intentional acts, nor does Defendant even attempt to argue how such a rule could derive from the language of the Constitution.

Two mistaken assumptions underlie Defendant's erroneous conclusion that a taking cannot result from a single flooding event: 1) that the line between a "tort" and a "taking" is absolute and distinct; and 2) that the standard to establish a taking where the government is *intending* to flood land is the same as the standard where flooding is *incidental*. This Court, in *Hansen v. United States*, explored "nearly two centuries of takings jurisprudence," finding that "there is no clear cut distinction between torts and takings," and that "it is not fatal to a plaintiff's claim or this court's jurisdiction if the government alleges that the facts might give rise to a tort." 65 Fed. Cl. at 80, 96 ("The development of takings law was, in effect, an extension of the principles of trespass and nuisance to the actions of the government."). The law ultimately "came to rest upon a distinction between 'direct' and consequential harm as the key difference" between takings and torts and supported that plaintiffs could bring takings claims "[o]nly where the harm resulted directly from government action." *Id.* at 95-6.

Additionally, before the Tucker Act provided a statutory basis for takings claims, courts often analyzed takings as alleged violations of an implied contract between the government and its citizens. *Id.* at 96. Thus, many cases required an implied or express specific intent by the government to appropriate an interest in the owner's property to establish a taking. *Id.* The jurisprudence continued to embrace this element of specific intent even after enactment of the Tucker Act, and *Ridge Line* established intentional acts as a distinct and sufficient basis for the government's liability. *Id.* at 96-118.

Indeed, the Supreme Court has explained that proof of repeated invasions is only necessary when the intent of the government is uncertain. In *Portsmouth Harbor*, the government erected a fort and installed guns on land adjacent to plaintiff's ocean-side property, used as a summer resort. 260 U.S. at 328. Plaintiff alleged that the firing of guns across its property had enacted a taking because "the public has been frightened off the premises," preventing plaintiff from using its land as a resort. *Id*. The Court had previously found that the mere erection of the fort and the firing of guns on two occasions had not established the requisite intent of the government to appropriate plaintiff's land, but denied a motion to dismiss where the repetition of firing events and the establishment of a fire control station "may be found to show an abiding purpose to fire when the United States sees fit, even if not frequently, or they may be explained as still only occasional torts. That is for the Court of Claims when the evidence is heard." *Id*. at 330. The Court explained, "[i]f the United States, with the *admitted intent* to fire across the claimant's land at will should fire a *single* shot or put a fire control upon the land, it well might be that the taking of a right would be complete." *Id*. at 329 (emphasis added). However, "when the intent thus to make use of the claimant's property is not admitted, while a single act may not be enough, a continuance of them in sufficient number and for a sufficient time may prove . . . an abiding purpose." *Id*. at 330.

It is unsurprising that numerous flooding cases hinge on whether there is a pattern or repetition of events sufficient to establish the requisite intent or foreseeability to constitute a taking. Nearly unique to the case at bar, it is extremely rare for the government to *plan and intend* to deliberately flood private land, particularly without obtaining the requisite easements. Thus, most flood-related takings cases result from the

unintended consequences of other government projects. *See B Amusement Co. v. United States*, 180 F. Supp. 386, 387-88 (Ct. Cl. 1960) (one flood did not constitute a taking where melting of an ice gorge jammed in the river was not the natural consequence of a government project to narrow the river channel to improve navigability, and government intended to protect plaintiffs' property, not take it); *Fromme v. United States*, 412 F.2d 1192, 1194 (Ct. Cl. 1969) (government project constructing Victoria Channel to provide "shallow-draft navigation from the main channel of the Gulf Intracoastal Waterway to the vicinity of Victoria, Texas" which occasionally interfered with the runoff of floodwaters from plaintiff's land did not enact a taking); *Sanguinetti v. United States*, 264 U.S. 146, 147-48 (1924) ("It was not shown, either directly or inferentially, that the government or any of its officers, in the preparation of the plans or in the construction of the canal, had any intention to thereby flood any of the land here involved, or had any reason to expect that such would follow."); *Ark. Game & Fish Comm'n v. United States*, 637 F.3d 1366, 1367 (Fed. Cir. 2011) (temporary deviations in the government's operation of a dam that increased flooding on plaintiff's land did not constitute a taking).

Defendant's reliance on those cases here is misplaced. In all of those cases, plaintiffs could not show that the government specifically intended to flood their land to provide public benefit. For example, in *B Amusement Co*., the court held that one flooding was not a taking because

> "[T]o constitute a taking there must be an intent on the part of the United States to [flood] plaintiffs' properties, or, at least, an intention to do an act the natural consequences of which was to [flood] the property. Here, however, the record clearly shows that the defendant's acts were designed to protect plaintiffs' private properties, not to take them; nor can it be said that the natural consequences of

> these acts would result in a taking of their properties for public use."

180 F. Supp. at 389.   Under the factual circumstances of Defendant's cases, the requirement for a showing of more than one or two floods "is understandable, since the rule is really an application to this particular situation of the general principle that the Government is not liable under the Fifth Amendment for 'consequential damages' arising from the carrying on of its lawful activities."   *National By-Products, Inc. v. United States*, 405 F.2d 1256, 1273 (Ct. Cl. 1969).

In the instant case, the flooding of Plaintiffs' property was not the "consequential" damage or unfortunate and unforeseen by-product of unrelated projects to improve navigability or otherwise build or improve infrastructure.   Rather, the flooding was the objective and mission, the realization of a permanent plan that adjudged Plaintiffs' land expendable when needed to protect land in and around a formerly-prosperous river city. The United States has articulated in legislation the "admitted intent" to invade Plaintiffs' property at will.   Thus, the levee detonation is the "single shot" that "completed" the taking.   *See Portsmouth Harbor*, 260 U.S. at 329.

### 3.   Cases Addressing Floodway Construction and Contemplated Destruction Support Plaintiffs' View of Takings Jurisprudence.

In addition to misreading "two centuries of takings jurisprudence," Defendant overreaches in its discussion of the few cases that deal with the United State's legislated plan to flood certain private lands to protect others.   In *Danforth v. United States*, 105 F.2d 318, 319 (8th Cir. 1939), *reversed in part and affirmed in part*, 308 U.S. 271, 286 (1939), the plaintiff alleged that *mere enactment* of the Flood Control Act of 1928, or alternatively, construction of the setback levee, in and of itself, and prior to degradation

of the frontline levee, enacted a taking of his land.  Akin to *Portsmouth Harbor's* holding that mere erection of the fort could not constitute a taking, the Court denied Danforth's claim because "[s]uch legislation may be repealed or modified, or appropriations may fail."  308 U.S. at 286.  *See United States v. Sponenbarger*, 308 U.S. 256, 267-68 (1939) (property was not taken by mere enactment of 1928 Act where construction of floodway at issue was abandoned).

Significantly, the *Danforth* courts were not faced with the government's *activation* of the Floodway by use of explosives, an act the Eighth Circuit stated the government could not "rightfully" do until the fuse plug sections had been degraded, 105 F.2d at 321, nor did they consider any facts similar to the present case regarding the devastation caused by the Corps' destruction of portions of the frontline levee not prescribed in any easement or property right granted to the government.  Moreover, while the *Danforth* court found that a "possible result" of the construction of the setback levee was to increase the depth of water covering appellant's land during a flood event, no increased damage had been proven on the record before it, "[t]he 1937 flood did go over the riverside levee but the record does not indicate whether any increased damage actually resulted."  *Id.* at 320.  It is unsurprising and inapposite to the current case that the *Danforth* court found no taking on the facts and circumstances before it.  In fact, the court's language implies that, upon adequate proof of damages, government-initiated intentional flooding would give rise to a takings cause of action.  *Id.* at 320-21.

Likewise, in *Matthews v. United States*, 87 Ct. Cl. 662 (1938), the plaintiff claimed his land was taken by *mere enactment* of the 1928 Act.  The court rejected this claim, finding that "[n]either the United States nor any of its agents prior to institution of

this suit caused any headwaters to flow over or stand upon plaintiff's land.   The [g]overnment has not caused any additional backwaters to flow over or be impounded upon plaintiff's land, nor have it caused any physical damage or injury to the land, the drainage ditches therein, or to the timber growing thereon."   *Id.* at 708 (quoted in *Matthews v. United States*, 113 F.2d 452, 454 (8th Cir. 1940)).   "Only consummated acts which actually deprive an owner of property or of valuable existing property rights . . . can be held the basis of an implied promise to pay."   *Id.*

What *Matthews* holds to be the basis of an actionable taking is precisely what is at issue here.   Plaintiffs do not allege a taking based on the mere enactment of legislation that could be repealed or construction of a floodway that might never be operated. Instead, the Court is faced with detailed allegations of a consummated act.   Defendant, with the use of explosives, deliberately destroyed all flood protection Plaintiffs' land enjoyed, sending a 15 foot wall of water crashing through it.   This action destroyed Plaintiffs' "land, the drainage ditches therein, [and the crops] growing thereon."   *Id.*

Interestingly, the government failed to cite *Story v. Marsh*, 732 F.2d 1375 (8th Cir. 1984), the one litigation involving the Floodway operating plan actually utilized in May 2011.   In that case, the court denied an injunction to prevent the government from artificially crevassing the frontline levee, finding that such action was committed to agency discretion.   *Id.* at 1379-80.   However, the court noted that the government likely possessed *insufficient* easements to operate the Floodway under the 1983 plan.   "The modified flowage easements executed by the landowners convey to the government only the right to flood lands by artificial crevassing of the fuse plug sections of the frontline levee.   However, the 1983 plan also calls for the artificial crevassing of the section of the

frontline levee between the two fuse plug sections." *Id.* at 1384.  The court further made clear that, "if the government has failed to obtain the necessary easements," "the landowners have an adequate remedy [for a takings claim] under the Tucker Act." *Id.*

For the first time, this Court must consider whether activation of the Floodway by denotation of explosives may constitute a taking.  The jurisprudence holds that it can.  This case should move to discovery so the parties can test Plaintiffs' allegations – and the *Story* court's conclusion – that the government did not, in fact, possess the necessary easements to activate the Floodway under the current operating plan.

> **4.      Although Unnecessary, Plaintiffs Have Alleged a "Permanent Liability to Intermittent but Inevitably Recurring Overflows."**

Defendant's Motion argues – incorrectly – that the Amended Complaint must be dismissed because the flooding of Plaintiffs' land is not "inevitably recurring."  As explained above, it is simply wrong that the government's intentional destruction of private property for the public interest only constitutes a taking if it is part of a permanent liability to inevitably recurring invasions.  *See United States v. Lynah*, 188 U.S. 445, 469-70 (1903) ("It would be a very curious and unsatisfactory result, if in construing a provision of constitutional law . . . the government . . . can inflict irreparable and permanent injury to any extent, can, in effect, subject [property] to total destruction without making any compensation.")

Nonetheless, Plaintiffs have met Defendant's claimed requirement.  Plaintiffs have explicitly alleged that, both as a result of the legislative scheme that anticipates continued periodic destruction of the levee at the Corps' discretion and the inundated condition of the parcels' drainage ditches with sand and gravel resulting from the levee's

destruction in this instance, Plaintiffs' land is, in fact, subject to intermittent and inevitably recurring flooding.

The phrase "intermittent but inevitably recurring" was coined in *United States v. Cress*, 243 U.S. at 328.   In that case, the government built locks and dams on the Cumberland and Kentucky rivers in order to raise the level of certain tributaries for the purpose of improving navigability.   *Id*. at 317-20.   As a result of this government construction, the plaintiff's land was not permanently inundated, but was subject to intermittent overflows of water from the river "so as to depreciate it one half of its value." *Id*. at 318.

The government contended that, because the land was not permanently inundated, destroyed, or rendered useless, the flooding did "not measure up to a taking, but is only a 'partial injury,' for which the government is not liable." *Id*. at 327.   The Court disagreed, finding that the flooding could not be deemed "consequential" and thus outside the ambit of a taking, because it stemmed from a "permanent condition" (the locks and dams) that subjected plaintiff's land to recurring overflows and a depreciation in value.   "There is no difference of kind, but only of degree, between a permanent condition of continual overflow by backwater and a permanent liability to intermittent but inevitably recurring overflows; and, on principle, the right to compensation must arise in the one case as in the other." *Id*. at 327-328.   Significantly, *Cress* did not hold or even intimate that a single flood event pursuant to an established government policy to deliberately flood certain lands in an effort to prevent flooding elsewhere, that destroyed or severely depreciated the value of that land, could not be a taking.

Plaintiffs here have alleged *both* a permanent, physical destruction and taking of their property (consisting of land, crops, buildings, businesses, and infrastructure) *and* that their land is subject to intermittent and inevitably recurring flooding.  Am. Compl. ¶ 2, 3, 4, 50-61.  Defendant cannot erase these explicit allegations by making conclusory and unsupported statements that "operation of the Floodway results in temporary flooding."  Def's Br. at 6 (*citing Matthews*, 87 Ct. Cl. at 684 (indicating the design of the 1928 Act was to have diverted waters return to the river through the lower fuse plug and to have levees restored by the government)).   Although the flow of water may have abated, the resultant destruction of Plaintiffs' property and the recurring nature of the flooding have been adequately alleged, including by reference to the established plan for operation of the Floodway and the blockage of drainage ditches arising from the actions at issue.   *See, e.g. Cress*, 243 U.S. 316 (land subjected to intermittent overflows of backwater and interference with water rights of separate plaintiff that destroyed the power to plaintiff's mill business each constituted takings); *Cooper v. United States*, 827 F.2d 762 (Fed. Cir. 1987) (temporary flooding condition caused by government's construction project that blocked river destroyed and enacted a taking of plaintiff's timber).

Moreover, contrary to Defendant's contention, Def's Br. at 15-6, Plaintiffs' claims properly include damages resulting from the sediment that the government caused to inundate Plaintiffs' land.  *See* Am. Compl. ¶¶ 2, 52.  "[I]t remains true that where real estate is actually invaded by superinduced additions of water, *earth, sand, or other material* . . . so as to effectually destroy or impair its usefulness, it is a taking with the meaning of the Constitution.  *Pumpelly v. Green Bay Co.*, 80 U.S. 166, 181 (1871)

(emphasis added).   Plaintiffs clearly state a takings claim, even under Defendant's

erroneous heightened standard.

> **C.    Defendant Relies on An Alternative Factual Narrative That Is Not Properly Before the Court and Conflicts with the Amended Complaint's Allegations.**
>
> > **1.    This Court Must Not Consider Defendant's Proffered Facts from Cases and Letters Not Mentioned in the Amended Complaint.**

Defendant outrageously urges the Court to circumvent the long-established rule

that, on a motion to dismiss, a Court must limit itself to the facts pled in the Amended

Complaint and accept them as true by claiming that this Court may "derive" and apply

facts from court decisions rendered in 1938 and 1939.   Def's Br. at 2.   While those

decisions relate to the general subject matter of the Floodway, they were brought by

different plaintiffs, pursuing different legal theories, based on wholly distinct evidence,

and seeking unique relief.   There is no basis or authority for the proposition that this

Court can credit and rely upon such factual recitations to resolve critical issues in a

motion to dismiss, and Defendant cites none.[2]

Defendant's bald assertion of an identity of issues and privity lacks any factual

basis which would support application of the doctrine of collateral estoppel.   That

doctrine applies only when: (1) the issue previously adjudicated is identical with the issue

to be decided in the subsequent action; (2) the issue was actually litigated; (3) the

---

[2]   Defendant incongruously and without explanation or application cites *Montana v. United States*, 440 U.S. 147 (1979).   In that case, the court found that a subsequent suit was precluded by the doctrine of *res judicata* where the nonparty in the previous litigation (the United States) controlled that litigation by requiring the first suit to be filed, reviewing and approving the complaint, paying the attorneys' fees and costs, directing the appeal to the state supreme court, appearing in the state proceeding as amicus, and directing the filing and eventual abandonment of an appeal to the Supreme Court.   *Id.* at 155.   Defendant makes no claim that Plaintiffs here similarly controlled the litigation in the 1930s.

determination of the issue in the prior action was necessary and essential to the resulting judgment; and (4) the party defending against preclusion had a full and fair opportunity to litigate the issue in the prior action. *Banner v. United States*, 238 F.3d 1348, 1354 (Fed. Cir. 2001).  Even if Defendant had made any effort to demonstrate identity of issues and parties (which it has not done and cannot do), the intricate factual analysis required to determine the applicability of estoppel to findings of fact made in 1938 and 1939 cannot possibly be determined on a motion brought under Rule 12(b)(6).

Defendant also attaches two letters to its brief and asks the Court to rely on the letter from the Chief of the Corps to Congress referencing a "proposed improvement" that would protect the Floodway "from floods up to a stage of 60 feet on the Cairo gage, but would permit breaching of the levees at a stage of 58 feet if a flood higher than 60 feet were forecast."  Def's Br. at Ex. C at 148; *See* Def's Br. at Ex. D.  Defendant claims that these letters are properly considered on a motion to dismiss because paragraph 42 of Plaintiffs' Amended Complaint refers to the 1965 Flood Control Act and "the Amended Complaint relies *heavily on its terms and effects*."  Def's Br. at 5 (emphasis added).

Defendant's assertion overreaches.  Plaintiffs do not "solely rely" on the Flood Control Act of 1965 such that it is "integral to the complaint."  *See Int'l Audiotext Network, Inc. v. Am. Telephone and Telegraph Co.*, 62 F.3d 69, 72 (2d Cir. 1995) (contractual agreement not specifically incorporated into the complaint was considered by the court on a motion to dismiss because the complaint "relie[d] heavily upon its terms and effects"); *see also In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) ("As a general matter, a district court ruling on a motion to dismiss may not consider matters extraneous to the pleadings.  However, an exception to the general rule

is that a document integral to or explicitly relied upon in the complaint may be considered") (internal citations omitted).   Indeed, the Court can ultimately decide whether the mode and location of the government's detonation of the frontline levee comported with the specifications and scope of the easements the government possesses over some of the Plaintiffs' land and whether the flood event ultimately constituted a taking of this and land lacking government easements without *any reference whatsoever* to the legislated modifications made to the plan over the years.   Moreover, the Amended Complaint makes absolutely no mention of and in no way relies on the letters referenced by the Defendant.  (Exs. C & D).   *See Chambers v. Time Warner, Inc*., 282 F.3d 147, 154 (2d Cir. 2002) (error for court to consider on motion to dismiss certain agreements not relied on by plaintiff in drafting complaint).

Indeed, recommendations of the Corps discussed in these letters, without more, cannot be assumed to have been legislated and completed as a matter of fact.   *See Sponenbarger*, 308 U.S. at 268 ("In general language [the Flood Act] adopted a program recommended by the Chief of the Army Engineers, but Congress did not sweep into the statute every suggestion contained in that recommendation.").   For example, Exhibit C acknowledges, "it is deemed necessary to secure modified easements in the Birds Point-New Madrid area that will specifically permit breaching of the levee at any point."  Defs. Br., Ex. C at 148.   Plaintiffs have explicitly pled that the government, against its own acknowledgement and recommendation, *failed to seek and obtain these needed easements*.   Am. Compl. ¶ 43, 45, 47-48.   The proffered letters have been offered to contradict Plaintiffs' allegations despite the absence of any mechanism at this stage of the

proceedings to resolve disputed facts.  They plainly cannot be considered and credited at this stage of the proceeding.

In any event, Plaintiffs note that, even if the United States actually *did* raise the frontline levee from 58 to 60 feet at some point before May 2011, this fact would be immaterial to Plaintiffs' allegations and the Court's consideration of Defendant's motion.  Whatever the height of the levee, Plaintiffs have alleged that the government deliberately reduced it to zero by destroying large swaths of the levee with explosives, thereby eliminating all flood protection that Plaintiffs' land ordinarily enjoyed and causing a 15 foot wall of water to crash through their land and everything on it.   This Court must decide, based on the Amended Complaint, and not on Defendant's recounting of its own alternate and as yet unsupported version of the facts, whether the Corps' activation of the Floodway by denotation of explosives gives rise to a valid takings claim.  Contrary to Defendant's contention, this Court cannot rely on the factual recitations of earlier court opinions that were concerned with entirely different legal questions and addressing entirely different factual records than will be developed here.

## 2. Defendant's Proffered Facts Are Plainly Inconsistent with the Facts As Pled.

According to Defendant, there are a number of key facts that together absolve it of liability and dispose of the Amended Complaint.  Reduced to its essence, Defendant alleges that all of Plaintiffs' land is naturally subject to periodic flooding.  Def's Br. at 8.  Defendant then argues that the provisions of the 1965 Act provided greater flood protection than had ever existed before.  Def's Br. at 12.[3]  Finally, Defendant contends

---

[3]   Defendant consistently refers to the 1965 Plan and apparently fails to appreciate significant modifications made to the operating plan in or around 1983, including the provision that the levees may be detonated in additional areas.  *See Story*, 732 F.2d at

that, pursuant to the Flood Control Acts, the United States only needed to obtain flowage easements to the extent that it exposed land to the risk of more frequent (as opposed to more extreme, severe, or damaging) flooding and that, because Plaintiffs now supposedly enjoy greater flood protection than ever before, they do not and cannot allege that the government actually subjected them to any additional flooding whatsoever.   Def's Br. at 10-14.[4]

The problems with this proffered narrative are myriad.   One fundamental problem is that Defendant constructs this factual recitation entirely out of whole cloth found nowhere in the Amended Complaint.   Another problem with the proffered narrative is that, despite Defendant's suggestion to the contrary, Def's Br. at 3, it directly conflicts with numerous explicit allegations in and the entire underlying premise of the Amended Complaint.

Defendant is incorrect that Plaintiffs' land is currently subject to "periodic flooding from the headwaters of the Mississippi River."   Def's Br. at 8.   As Defendant admits in its brief, prior to enactment of the 1928 Act and creation of the Floodway, local interests constructed the frontline levee, which *protected* Plaintiffs' land from flooding. *Id*. at 8-9.   The creation of the Floodway and institution of the previous and current operating plans allowed for the Corps, at its discretion, to destroy portions of that levee, thereby *eliminating* the flood protection that Plaintiffs' land historically and ordinarily enjoyed.   Am. Compl. ¶¶ 50, 84.   The Corps exercised this right on May 2, 2011.   Am.

---

1384.   The May 2, 2011, activation of the Floodway applied the 1983, not 1965, plan. *See* Am. Compl. ¶ 48

[4/]   Plaintiffs dispute Defendant's interpretation of the relevant provisions of the Acts. More importantly, however, Defendant need not only adhere to statutes, but must adhere to the requirements of the Constitution. *See Pumpelly,* 80 U.S. at 175.

Compl. ¶ 51.  There is no question (or apparent dispute) that, absent government conduct, Plaintiffs' land would not have been subject to the extent of flooding it suffered, a 15 foot wall of water, sand, and gravel crashing through it, largely destroying the land and all structures on it and rendering its drainage system ineffective for the foreseeable future. *See* Am. Compl. ¶¶ 6, 37, 52, 62, 63, 82 ("destruction of, damage to, and devaluation of … property was the natural, direct, and probable consequence of Defendant's operation of the Floodway in the mode and method Defendant used, and would not have occurred at all, or in such magnitude but for Defendant's actions.").

The fact that there may have been some overtopping of the levee by flood waters on and around May 2, 2011, Def's Br. at 7-9, absent government detonation and destruction of the levee, does not defeat Plaintiffs' claim.  Defendant's assertion, Def's Br. at 7-8, that the Court should formulaically only consider the number of flood events, and not their severity or destructiveness, strains credulity and common sense.  It is also contrary to law.  In *Ridge Line*, the Federal Circuit found that a taking could be shown where plaintiff's property was subjected to a greater *volume* of storm run-off (not more instances of storm run-off) due to the construction of impervious surfaces on much of the adjacent government property.  346 F.3d at 1356.  As a matter of common sense and evidence that will be presented in due course, there is a material difference between "flooding" from the overtopping of a 58 foot protective barrier and the tidal wave that occurs when the flood waters that collect against that barrier are released as that barrier is destroyed by explosion.  The government has not paid for the right it exercised on May 2, 2011, and compensation for the destruction it wrought is now appropriate.

**D.      Plaintiffs Sufficiently Alleged That Easements Owned by the United States Were Insufficient to Allow the Destruction of the Levee on May 2, 2011.**

Defendant concedes that the Corps' actions on May 2, 2011, failed to conform to the specifications of the easements held by the United States over portions of Plaintiffs' land. *See* Def's Br. at 12-13. However, it contends that modified easements were not necessary because the new plan provided greater rather than less protection to Plaintiffs. Def's Br. at 13. Defendant's assertion of fact is conclusory, unsupported, largely immaterial, and premature at this stage of the proceedings. *See Pumpelly,* 80 U.S. at 175 (rejecting a defendant's averment in a taking case that their actions were authorized by statute because such a statement "pleads a conclusion of law, and does not state the facts on which the court can construe the law for itself and ascertain if the fact pleaded is a good defense.") Even if Defendant can eventually establish as a matter of fact that the levees were raised from 58 to 60 feet at some point, (*see* discussion of letter *supra* in Section III(C)(1)), this does not negate or contradict the fact currently alleged by Plaintiffs, that they suffered greater flooding and more damage because the levee was destroyed in the method prescribed by the current operating plan, as opposed to the specifications in their easements. Am. Compl. ¶¶ 94-99. Defendant exceeded the scope of the easement granted to them and compensation is due.

This Court applies state law when considering whether Defendant exceeded the scope of the easements or whether its conduct may somehow be subsumed within the easements' specifications. *Stop the Beach Renourishment, Inc. v. Fla. Dep't of Envtl. Prot.*, ____ U.S. ___, 130 S. Ct. 2592, 2612 (2010) (Because real property rights arise from state law, the extent of the plaintiffs' property interests in a right-of-way depend on the law of the state in which the property is located.); *Phillips v. Wash. Legal Found.*, 524

U.S. 156, 164 (1998) ("Because the Constitution protects rather than creates property interests, the existence of a property interest is determined by reference to 'existing rules or understandings that stem from an independent source such as state law.'") (citation omitted).   Under Missouri law, the question calls for a fact-intensive inquiry that evaluates the intent of the parties in light of and derived from all the circumstances.  *See Grider v. Tingle*, 325 S.W.3d 437, 449 (Mo. Ct. App. 2010) ("surrounding circumstances may be considered" when there is a dispute as to the "meaning [or extent] of an easement"); *Heigert v. Londell Manor, Inc.*, 834 S.W.2d 858, 867 (Mo. Ct. App. 1992) (Courts may consider the circumstances existing at the time an easement was created to determine the meaning of its terms).  This fact-intensive question must be the basis of discovery and likely expert testimony regarding the likely and actual effects to the land from the two methods of detonation and whether the new mode is a reasonably foreseeable use of the right granted in the original easement.  This is not a question appropriate for resolution on a motion to dismiss.

Plaintiffs have pled and the government has not disputed that the easements covering 80% of land in the Floodway do not conform to the government action that took place on May 2, 2011.  Am. Compl. ¶ 49.  Plaintiffs have also alleged that 20% of the Floodway is uncovered by any easement that would grant the United States a right to flood it.  *Id.* ¶¶ 40, 49.  Finally, Plaintiffs have alleged that the flooding was greater and the damage was more extensive under the current operating plan than if the United States had acted in conformity with its easements.  *Id.* ¶¶ 94-99.  This is sufficient at this point in the proceedings to state a takings claim.  Defendant's motion must be denied.

## IV. CONCLUSION

Plaintiffs have adequately pled that the United States, pursuant to its established plan and policy, intentionally flooded, destroyed, and damaged Plaintiffs' property on May 2, 2011, for the express purpose of preventing flooding elsewhere. Defendant's unsupported alternative narrative, extraneous documents, and misstatements of law cannot defeat Plaintiffs' claims. Unable to combat Plaintiffs' Amended Complaint on its face, Defendant has grasped at improper and incongruous straws and its motion should be summarily denied.

Dated: November 10, 2011

Respectfully submitted,

COOK, BARKETT, PONDER & WOLZ, L.C.

By: _____*/s/ J. Michael Ponder*_____
J. Michael Ponder  -  MO 38066
Phillip J. Barkett, Jr.  – MO 22958
Kathleen A. Wolz  -  MO 35495
715 N. Clark, P.O. Box 1180
Cape Girardeau, MO 63702-1180
Phone: 573-335-6651
Fax:    573-335-6182
E-mail:  mponder@cbpw-law.com
          pbarkett@cbpw-law.com
          kwolz@cbpw-law.com

COHEN, MILSTEIN, SELLERS & TOLL, PLLC

By: _____*/s/ Benjamin D. Brown*_____
Benjamin D. Brown  -  DC 495836
Kathleen Konopka  -  DC 495257
1100 New York Avenue, NW
Suite 500 W
Washington, D.C. 20005
Phone: 202-408-4600
Fax:    202-408-4699
E-mail: bbrown@cohenmilstein.com
          kkonopka@cohenmilstein.com

**ATTORNEYS FOR PLAINTIFFS**
Service by e-filing