# In the United States Court of Federal Claims

No. 11-275L
(Filed:  May 4, 2012)

_____

|  |  |  |
|---|---|---|
| BIG OAK FARMS, INC., et al., | ) | |
| | ) | **Fifth Amendment Taking; Failure to** |
| Plaintiffs, | ) | **State a Claim Under RCFC 12(b)(6);** |
| | ) | **Flood Control Act of 1928, 33 U.S.C.** |
| v. | ) | **§§ 702 et seq.; Distinction between** |
| | ) | **Taking and Tort under <u>Ridge Line</u>** |
| THE UNITED STATES, | ) | **<u>v. United States</u>, 346 F.3d 1346 (Fed.** |
| | ) | **Cir. 2003)** |
| Defendant. | ) | |
| | ) | |

_____

*J. Michael Ponder*, Cape Girardeau, MO, for plaintiffs. *Phillip J. Barkett, Jr.* and *Kathleen A. Wolz*, Cape Girardeau, MO, and *Benjamin D. Brown* and *Kathleen Konopka*, Washington, DC, of counsel.

*Lary Cook Larson,* United States Department of Justice, Washington, DC, with whom was *Ignacia S. Moreno*, Assistant Attorney General, for defendant.

## OPINION

**FIRESTONE**, *Judge*.

On July 11, 2011, plaintiffs, landowners in Mississippi County, Missouri who own land located in the Birds Point-New Madrid Floodway, filed an Amended Complaint, alleging that defendant the United States ("the government") took their property without just compensation in violation of the Fifth Amendment of the United States Constitution. Plaintiffs allege that the government took their property when the Army Corps of Engineers activated the Birds Point-New Madrid Floodway on May 2, 2011 by breaching

the levee that protected plaintiffs' property with explosives, unleashing a flood that

caused damage to plaintiffs' land, crops, equipment, and infrastructure, as well as leaving

behind sand and gravel deposits that subject plaintiffs' property to flooding during low-

level rainstorms.  Plaintiffs also allege that the United States failed to provide

compensation for the sand and gravel deposits left by the May 2, 2011 flooding event as

required by the flowage easements the government previously acquired across some of

plaintiffs' properties.  Pending before the court is the government's motion to dismiss

plaintiffs' Fifth Amendment takings claims.[1]

---

[1] The government's motion seeks to dismiss plaintiffs' case in its entirety.  However, by leave of
the court, plaintiffs filed a Second Amended Complaint on April 23, 2012.  ECF No. 32.  The
Second Amended Complaint amends Count III of the July 11, 2011 Amended Complaint, ECF
No. 8, to expressly state a breach of contract claim.  Count III of the July 11, 2011 Amended
Complaint originally requested specific performance to enforce plaintiffs' claim for
compensation regarding the government's failure to remove sand and gravel deposits left on
plaintiffs' property after the May 2, 2011 flood.  In the April 23, 2012 Second Amended
Complaint, plaintiffs now seek damages for the government's failure to pay plaintiffs for the
damage caused by the sand and gravel deposits in contravention of the easements entered into
between some plaintiffs and the government pursuant to the 1965 Flood Control Act.  Counts I
and II, encompassing plaintiffs' takings claims, remain unaltered.  In these circumstances,
defendant is not required to file a new motion to dismiss based on the amended pleading, and the
court may consider the motion as being addressed to the amended pleading.  6 Charles A. Wright
et al., Federal Practice and Procedure § 1476 (3d ed. 2012) ("[D]efendants should not be required
to file a new motion to dismiss simply because an amended pleading was introduced while their
motion was pending . . . [i]f some of the defects raised in the original motion remain in the new
pleading . . . . To hold otherwise would be to exalt form over substance.").  All references are to
the unchanged allegations in the July 11, 2011 Amended Complaint.

In this connection, the government acknowledged at oral argument that its motion to dismiss was
focused only on plaintiffs' takings claims and that its motion to dismiss did not extend to any of
plaintiffs' claims arising from the government's failure to pay plaintiffs for damages identified in
the easements.  Therefore, the court does not address Count III of the Second Amended
Complaint in this opinion.

I.      **Background**

The following facts are taken from plaintiffs' Amended Complaint unless

otherwise noted.  Plaintiffs own property within the Birds Point-New Madrid Floodway

("Floodway"), located in Mississippi County, Missouri.  The Floodway is a component of

the Mississippi River and Tributaries Project ("Project") located on the west bank of the

Mississippi River.  The Project was authorized by the Flood Control Act of 1928, 33

U.S.C. §§ 702 et seq., in response to unprecedented flooding of the Mississippi River.

The Project's levee system protects properties in the Floodway during smaller

Mississippi River floods, but the Project authorizes use of the Floodway when it is

necessary to protect the upstream town of Cairo, Illinois.

The Floodway comprises approximately 130,000 acres largely devoted to

farmland.  It is bound by a 56 mile long "frontline" levee on the east, next to the

Mississippi River, and a 36 mile long "setback" levee on the west.  The frontline levee

pre-existed the construction of the Floodway.  As originally developed by the Army

Corps of Engineers ("the Corps"), the Floodway was created under a plan known as the

"Jadwin Plan" by building the setback levee between three and ten miles west of the pre-

existing frontline levee, and degrading and lowering portions of the frontline levee to

correspond with a flood stage of fifty-five feet on the Cairo, Illinois gauge.  The degraded

sections of the frontline levee are known as the upper and lower "fuse plug."  Under the

Jadwin Plan, when the waters of the Mississippi River reached fifty-five feet on the Cairo

gauge, the water would flow over the fuse plug sections of the frontline levee, thereby

activating the Floodway, and averting flooding further upstream.

Under the Flood Control Act of 1928, which adopted the Jadwin Plan, Congress authorized the federal government to compensate landowners who would be subjected to "additional destructive flood waters that will pass by reason of diversions" from the Mississippi because of the degradation of the pre-existing levee system.  33 U.S.C. § 702d.  Pursuant to this mandate, the federal government acquired flowage easements over approximately eighty percent of the Floodway.  Under the terms of the 1928 Act, the government is immunized from liability arising from damages associated with operation of the Floodway.  The 1928 Act provides in relevant part that "[n]o liability of any kind shall attach to or rest upon the United States for any damage from or by floods or flood waters at any place." 33 U.S.C. § 702c.

The Floodway was operated for the first time in 1937.  Because the upper fuse plug area had not yet been degraded, the Corps breached the upper fuse plug area with dynamite, sending floodwaters into the Floodway.

Congress authorized modification of the Floodway plan in the Flood Control Act of 1965.  The new plan developed by the Corps allowed artificial crevassing by explosive detonation at the fuse plug section of the frontline levee.  Pursuant to the 1965 Act, the Corps also raised the frontline levee to provide protection to sixty feet as measured on the Cairo gauge, but is authorized to artificially breach the frontline levee at a stage of fifty-eight feet if a flood higher than sixty feet is forecast.[2]  In conjunction with the new plan,

---

[2] This fact is identified in the legislative history of the 1965 Flood Control Act.  The plaintiffs challenge the court's authority to consider this legislative document.  Plaintiffs argue that while they reference the 1965 Flood Control Act, their Amended Complaint does not reference nor does it rely on the House Reports referenced in the 1965 Flood Control Act and therefore the

the federal government acquired modified flowage easements over a portion of the Floodway between 1968 and 1974.  These modified flowage easements specified that the United States was condemning an "easement to flood and inundate" the Floodway lands "by diversion of flood waters of the Mississippi River and its tributaries in the operation of the Birds Point-New Madrid Floodway, said floodway to be placed in operation by artificial breaching or crevassing of any part or parts of the fuse plug sections of the frontline levee, between [certain fuse plug levee stations]."  Am. Compl. ¶ 43.  The easements also reserved to the landowners all rights and privileges to use and enjoy the land so long as the rights provided by the easements were not interfered with or abridged, and "to compensation as may become due by reason of excessive deposits of sand and gravel upon the lands . . . as a direct result of the planned operation of the floodway[.]"  Id. ¶ 44.

The Corps revised the Floodway's operation plan again in 1983 ("1983 plan"), allowing for artificial crevassing by explosion in additional locations along the upper fuse plug and the lower fuse plug.  The 1983 plan also authorized artificial crevassing at one point along the midsection of the frontline levee.  According to plaintiffs, the federal government and the Corps did not obtain the necessary flowage easements to allow for execution of the 1983 plan.

---

court should not consider the legislative history of the 1965 Act.  The court disagrees.  The court may take judicial notice of the language and legislative history surrounding the 1928 and 1965 Flood Control Acts.  See Anderson v. Holder, 673 F.3d 1089, 1094 n.1 (9th Cir. 2012) ("Legislative history is properly a subject of judicial notice.").  Furthermore, plaintiffs did not object to the government's reliance on facts regarding the changes to the levee system created by the 1928 and 1965 Acts at oral argument.

On May 2, 2011, when the flood waters reached a stage of fifty-eight feet on the Cairo gauge with a predicted stage in excess of sixty feet, the Corps, in accordance with the current operation plan, artificially breached the frontline levee and for the first time since 1937 activated the Floodway.  The frontline levee was breached in multiple locations in accordance with the current operation plan.  In the aftermath of the breaches, deep sand and gravel deposits were left on plaintiffs' farmland.  Plaintiffs allege that these deposits filled drainage ditches, and now cause intermittent and recurring flooding from low-level rain, storm, and other events that would not have otherwise occurred.  Plaintiffs further allege that the value of plaintiffs' properties has been diminished, plaintiffs' crops and farm equipment have been destroyed, and infrastructure in the Floodway has been destroyed.

In Count I of their Amended Complaint, plaintiffs allege that the government's operation of the Floodway on May 2, 2011 exceeded the scope of the flowage easements—to the extent they were acquired—on plaintiffs' land, and destroyed and devalued plaintiffs' property so as to effect a compensable taking under the Fifth Amendment of the Constitution of the United States.  Count II alleges the Fifth Amendment taking of a flowage easement across plaintiffs' property due to the current operation plan, which allegedly subjects the Floodway to inevitably recurring flooding.  Count II also alleges that the government "took" plaintiffs' land because the sand and gravel deposits caused by the May 2, 2011 flood filled plaintiffs' drainage ditches, subjecting plaintiffs' property to intermittent and inevitably recurring flooding.  Now before the court is the government's motion to dismiss Counts I and II of plaintiffs'

Amended Complaint for failure to state a claim under Rule 12(b)(6) of the Rules of the United States Court of Federal Claims ("RCFC").

## II.   Standard of Review

To avoid dismissal for failure to state a claim upon which relief may be granted under RCFC 12(b)(6), the complaint must contain facts sufficient to "'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  The plaintiff's factual allegations must "raise a right to relief above the speculative level" and cross "the line from conceivable to plausible."  Bell Atl. Corp., 550 U.S. at 555.  "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' . . . Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"  Iqbal, 556 U.S. at 678 (quoting Bell Atl. Corp., 550 U.S. at 555, 557).  In considering a motion under RCFC 12(b)(6), "the court must accept as true the complaint's undisputed factual allegations and should construe them in a light most favorable to the plaintiff."  Cambridge v. United States, 558 F.3d 1331, 1335 (Fed. Cir. 2009) (citing Papasan v. Allain, 478 U.S. 265, 283 (1986); Gould, Inc. v. United States, 935 F.2d 1271, 1274 (Fed. Cir. 1991)).

## III.   Discussion

### A.   Analytical Framework for Plaintiffs' Takings Claims

It is well-settled that government-induced flooding can give rise to a physical taking.  Nat'l By-Products, Inc. v. United States, 405 F.2d 1256, 1272-73 (Ct. Cl. 1969) (citations omitted); see also Ark. Game & Fish Comm'n v. United States, 637 F.3d 1366,

1374-75 (Fed. Cir. 2011), <u>cert. granted</u>, 80 BNA U.S.L.W. 3321, 3559, 3562 (U.S. Apr.

2, 2012) (No. 11-597).  However, it is equally well-settled "that not all floodings caused

by or partially attributable to governmental activities amount to a taking."  <u>Nat'l By-</u>

<u>Products</u>, 405 F.2d at 1273 (citations omitted); <u>Ridge Line, Inc. v. United States</u>, 346

F.3d 1346, 1355 (Fed. Cir. 2003).  The government has been held liable under the Fifth

Amendment for the construction and operation of its flood control projects where that

operation results in either permanent flooding or "intermittent but inevitably recurring

overflows."  <u>United States v. Cress</u>, 243 U.S. 316, 328 (1917).  The distinction between

"intermittent but inevitably recurring flooding" and occasional floods induced by

government projects arises from the general principle that the government is not liable

under the Fifth Amendment for "consequential damages" caused by its lawful activities.

<u>Nat'l By-Products</u>, 405 F.2d at 1273.  This principle has taken on meaning through

developing case law.  <u>Id.</u> (citing <u>Cotton Land Co. v. United States</u>, 75 F. Supp. 232, 233-

35 (Ct. Cl. 1948); <u>Jackson v. United States</u>, 230 U.S. 1, 23 (1913); <u>Sanguinetti v. United</u>

<u>States</u>, 264 U.S. 146, 150 (1924); <u>Danforth v. United States</u>, 308 U.S. 271, 286-87

(1939); <u>Matthews v. United States</u>, 87 Ct. Cl. 662, 720-24 (1938); <u>B Amusement Co. v.</u>

<u>United States</u>, 180 F. Supp. 386, 389 (Ct. Cl. 1960)).

    The essential inquiry into whether plaintiffs may state a Fifth Amendment takings

claim in the flooding context was recently distilled into a two-part analysis by the Federal

Circuit in <u>Ridge Line, Inc. v. United States</u>, 346 F.3d 1346 (Fed. Cir. 2003).  It has been

further refined by the Federal Circuit in cases applying the <u>Ridge Line</u> analysis.  <u>See</u> <u>Ark.</u>

<u>Game & Fish Comm'n</u>, 637 F.3d 1366 (Fed. Cir. 2011); <u>Cary v. United States</u>, 552 F.3d

1373 (Fed. Cir. 2009); Moden v. United States, 404 F.3d 1335 (Fed. Cir. 2005); Vaizburd

v. United States, 384 F.3d 1278 (Fed. Cir. 2004).  Under the first part of the Ridge Line

analysis, plaintiffs must allege sufficient facts to show that treatment under takings law,

as opposed to tort law, is appropriate in this case.  Ridge Line, 346 F.3d at 1355.  Under

the second part of the Ridge Line analysis, plaintiffs must allege sufficient facts to show

that there has been the taking of a "protectable property interest."  Id.  The first part of the

Ridge Line analysis, the distinction between takings and torts, is particularly important

because this court has jurisdiction over takings claims under the Tucker Act, but not over

tort actions.  See 28 U.S.C. § 1491(a).  Furthermore, as noted above, the government is

immune from liability for tort damages under the Flood Control Act of 1928, 33 U.S.C. §

702c.[3]

    The Ridge Line tort-takings inquiry consists itself of two prongs.  Under the first

prong, the court must determine the intent behind the alleged government action.  A

property loss is compensable as a taking if the government intends to invade a protected

property interest, or if the asserted invasion is the "direct, natural, or probable result of,"

and not the "incidental or consequential injury inflicted by," the government action.

Ridge Line, 346 F.3d at 1355 (quoting Columbia Basin Orchard v. United States, 132 F.

Supp. 707, 709 (1955); Owen v. United States, 851 F.2d 1404, 1418 (Fed. Cir. 1988)).

Under the second prong of the tort-takings analysis, the government's invasion must

---

[3] However, 33 U.S.C. § 702c does not act to repeal Tucker Act jurisdiction over breach of
contract claims against the United States, California v. United States, 271 F.3d 1377, 1383 (Fed.
Cir. 2001), or Fifth Amendment takings claims, Turner v. United States, 17 Cl. Ct. 832, 834-35
(1989), rev'd on other grounds by 901 F.2d 1093 (Fed. Cir. 1990).

"appropriate a benefit to the government at the expense of the property owner, or at least preempt the owner[']s right to enjoy his property for an extended period of time, rather than merely inflict an injury that reduces its value." Ridge Line, 346 F.3d at 1356 (citations omitted).  Under this "appropriation" prong, flooding must result in "sustained and substantial damage – if not permanent flooding, then at the very least it must result in a 'permanent liability to intermittent but inevitably recurring overflows.'" Nicholson v. United States, 77 Fed. Cl. 605, 616 (2007) (quoting Cress, 243 U.S. at 328).

Thus, whether government-induced flooding constitutes a taking rather than a tort depends on the character of the flooding at issue.  As the Supreme Court explained in United States v. Cress, 243 U.S. at 328, "[I]t is the character of the invasion, not the amount of damage resulting from it, so long as the damage is substantial, that determines the question whether it is a taking."  To sufficiently allege a taking, plaintiffs "must allege that 'the government's interference with any property right of [plaintiffs] was substantial and frequent enough to rise to the level of a taking.'" Cary, 552 F.3d at 1380 (quoting Ridge Line, 346 F.3d at 1357).  Isolated invasions, including one or two floods, do not constitute a taking, but "intermittent, frequent, and inevitably recurring flooding" may mandate compensation under the Fifth Amendment.  Fromme v. United States, 412 F.2d 1192, 1196 (Ct. Cl. 1969); Ridge Line, 346 F.3d at 1357.  Where it is not "obvious" that the government action will lead to frequent and inevitably recurring flooding, the flooding will not result in a taking.  Ark. Game & Fish Comm'n, 637 F.3d at 1378 (citing Barnes v. United States, 538 F.2d 865, 873 (Ct. Cl. 1976)).  Damages from government-induced flooding that cannot be deemed permanent or intermittent and inevitably

recurring are consequential damages that may only give rise to a claim in tort.  <u>Barnes</u>, 538 F.2d at 870.

Moreover, in the context of flood control plans such as the one at issue here, the Supreme Court has held that the government is not responsible for "damages which may result from conjectural major floods, even though the same floods and the same damages would occur had the government undertaken no work of any kind."  <u>United States v. Sponenbarger</u>, 308 U.S. 256, 265 (1939).  In addition, the court cannot ignore the benefits landowners receive from government flood control projects.  As stated in <u>Sponenbarger</u>, "[e]nforcement of a broad flood control program does not involve a taking merely because it will result in an increase in the volume or velocity of otherwise inevitably destructive floods, where the program measured in its entirety greatly reduces the general flood hazards, and actually is highly beneficial to a particular tract of land."  <u>Id.</u> at 266.

Finally, assuming the court determines that the subject flooding may be characterized as a taking, rather than a tort, plaintiffs must still satisfy the second part of the <u>Ridge Line</u> analysis.  As noted above, to do so, plaintiffs must allege sufficient facts to show that they "possessed a protectable property interest in what [they] allege[] the government has taken."  <u>Ridge Line</u>, 346 F.3d at 1355.  In this case, the government does not dispute that plaintiffs have adequately alleged a property interest to the extent the alleged injuries to plaintiffs' properties exceed the scope of any existing flowage easements across plaintiffs' land.  <u>See Hendricks v. United States</u>, 14 Cl. Ct. 143, 149 (1987) ("To [the elements of proof required to show a taking through flooding], in these

circumstances, must be added the issue of whether the flooding was in excess of the scope of the flowage easements.").

## B.    History of Floodway Litigation

In addition to developing the general analytic principles outlined above, the courts have considered several takings claims litigated in the early twentieth century involving the Floodway itself.  Under the statutory scheme established by the Flood Control Act of 1928, 33 U.S.C. § 702d, the United States, in constructing the Floodway and degrading portions of the existing frontline levee, was required to "provide flowage rights for additional destructive flood waters that will pass by reason of diversions from the main channel of the Mississippi River."  To obtain the necessary flowage easements, the Act provided that the government could bring condemnation proceedings in the United States district courts.  Id.  The Act also expressly provided that in purchasing flowage easements, the benefits of the flood control plan "shall be taken into consideration by way of reducing the amount of compensation to be paid."[4]  Id.

---

[4] The plaintiffs challenge the court's consideration of facts related to the physical characteristics of the land within the Floodway, that are discussed in Danforth v. United States, 105 F.2d 318 (8th Cir. 1939), Matthews v. United States, 87 Ct. Cl. 662 (1938), and Danforth v. United States, 308 U.S. 271 (1939).  The government argues that the court can consider the facts discussed in these opinions based on the holding in Montana v. United States, 440 U.S. 147 (1979), a case dealing with collateral estoppel.  The court agrees with plaintiffs that collateral estoppel as to the factual issues actually litigated by the plaintiffs in Danforth and Matthews is not appropriate here.  However, the court may take judicial notice of the history of the Floodway construction and operation found in the case law.  See Advanced Software Design Corp. v. Fed. Reserve Bank of St. Louis, 583 F.3d 1371, 1379 n.3 (Fed. Cir. 2009) (citing Opoka v. I.N.S., 94 F.3d 392, 394 (7th Cir. 1996) (noting that the court can take judicial notice of a decision from another court or agency).

In <u>Danforth v. United States</u>, 308 U.S. 271 (1939), the Supreme Court considered a challenge to the compensation received by a landowner in the Floodway under the condemnation procedures set forth in the Flood Control Act of 1928.  The landowner argued, in part, that he was owed interest from the time of the taking of the flowage easement, leaving the Court to consider when the taking occurred.  The Court first held that "mere enactment" of the 1928 Act did not amount to taking.  <u>Id.</u> at 286.  Next, the Court concluded that the construction of the setback levee, which caused the plaintiff's land to retain water for longer periods of time after "unusual floods," did not amount to a taking, because the setback levee did not cause the plaintiff's land to bear a burden "of caring for floods greater than it bore prior to the construction."  <u>Id.</u>  In so holding, the Court noted that the plaintiff's land was "as well protected from destructive floods as" it was before the construction of the Floodway.  Moreover, the Court explained that the retention of water "for a somewhat longer period or its increase in depth or destructiveness by reason of the set-back levee" was merely an "incidental consequence" of building the setback levee that did not rise to the level of a taking.  <u>Id.</u> at 286-87.

Similarly, in <u>Matthews v. United States</u>, 87 Ct. Cl. 662, 1938 WL 3992, at *1-2 (1938), the United States Court of Claims considered the just compensation claim of a landowner in the Floodway based on the enactment of the 1928 Flood Control Act and the construction of the setback levee.  Like the Supreme Court in <u>Danforth</u>, the Court of Claims held that the enactment of the Act and the adoption of the Jadwin Plan did not give rise to a taking of the plaintiff's property.  <u>Matthews</u>, 1938 WL 3992, at *31.  The Court of Claims found that the plaintiff's property had always been, "and was at the time

13

of the enactment of the Flood Control Act, subject to overflow." <u>Id.</u> at *32.  In its

discussion of takings jurisprudence, the Court of Claims noted that any government

action that imposes only an "occasional, or incidental injury . . . is regarded as

consequential damages and does not constitute a taking." <u>Id.</u>  The Court also held that

"prospective encroachments" on the part of the government, "the direct effect and

consequences of which are problematical and conjectural, do not give rise to an

enforceable obligation to compensate.  Only consummated acts which actually deprive an

owner of . . . property rights, or acts so definite in character as to show a clear intention to

take . . . property rights . . . can be held the basis of an implied promise to pay." <u>Id.</u>

It is against this backdrop that the court now turns to the government's motion.

**C.    Plaintiffs Have Not Stated Takings Claims Based on the Operation of the Floodway**

**1.    Plaintiffs Have Not Alleged a Taking Based on Damage Caused by the May 2, 2011 Operation of the Floodway**

In Count I of their complaint, plaintiffs allege a Fifth Amendment taking based on

the "preemption of use and enjoyment of [plaintiffs'] property without just

compensation" because of the damage and destruction caused by the May 2, 2011 flood.

Am. Compl. at 15; ¶ 75.  Plaintiffs argue that they have alleged sufficient facts to meet

the requirements of <u>Ridge Line</u> by alleging that the government intended to flood their

land when it activated the Floodway, and that substantial harm resulted.  Plaintiffs argue

that where, as here, the government deliberately flooded their land, they do not need to

allege permanent or intermittent and inevitably recurring floods to meet the <u>Ridge Line</u>

test.  Instead, plaintiffs contend, a showing of inevitably recurring flooding is only

necessary, under <u>Ridge Line</u>, where the government does not specifically intend to flood land to provide public benefit.

The government argues that plaintiffs have not stated a claim because they have not alleged sufficient facts to satisfy both prongs of the <u>Ridge Line</u> tort-takings test. Under the government's view, plaintiffs must allege facts sufficient to create a plausible claim that the May 2, 2011 flood was either permanent, which admittedly is was not, or that the alleged flooding will frequently and inevitably recur.  <u>See Ridge Line</u>, 346 F.3d at 1357.  The government argues that because Count I alleges only a single flood, Count I must be dismissed.  The government relies on well-settled precedent which provides that one temporary flood cannot give rise to a taking.  <u>Ark. Game & Fish Comm'n</u>, 637 F.3d at 1374; <u>Ridge Line</u>, 346 F.3d at 1357 (citing <u>Eyherabide v. United States</u>, 345 F.2d 565, 569 (Ct. Cl. 1965)).  Instead, the government argues, damages caused by a single flood may only be compensated in tort, an action that is outside the jurisdiction of this court. <u>See Barnes</u>, 538 F.2d at 870.

The court agrees with the government that plaintiffs have not stated a valid takings claim in Count I of their complaint based on allegations of damages caused by the May 2, 2011 flood.  Where, as here, plaintiffs' claim is based on a single flood that has since receded, plaintiffs have not stated a takings claim.  "Releases that are ad hoc or temporary cannot, by their very nature, be inevitably recurring," and therefore cannot, under <u>Ridge Line</u>, result in a taking.  <u>Ark. Game & Fish Comm'n</u>, 637 F.3d at 1377; <u>see also</u> <u>Cary</u>, 552 F.3d at 1381 (holding that "floods that visit once and then recede do not

give rise to takings claims," such floods only "injure[] but do[] not appropriate"

property).

Contrary to plaintiffs' contentions, the fact that the government intended to flood

their property does not excuse plaintiffs from having to allege facts to show that there

will be frequent, inevitable flooding in the future.  See, e.g., Lengen v. United States, 100

Fed. Cl. 317, 342-43 (2011) ("Plaintiffs must satisfy both prongs of the Ridge Line test to

demonstrate that their claims are properly analyzed under takings law.").  In order to state

a takings claim under the conceded facts of this case, plaintiffs were required to allege

facts to show that flooding is likely to frequently repeat.  This they did not do.  Moreover,

the court cannot infer from the facts alleged in the Amended Complaint that there will be

inevitably recurring and intermittent flooding.

The plaintiffs allege that the May 2, 2011 flood was the second flood resulting

from operation of the Floodway.  The first flood took place in 1937.  Allegations of two

floods separated by nearly 75 years are not enough to support an inference of frequent

and inevitably recurring flooding to satisfy the Ridge Line test.  See Fromme, 412 F.2d

1192, 1197 (finding no taking where flooding only occurred once every fifteen years);

Bryant v. United States, 578 F.2d 1389, 1978 WL 23800, at *1 (Ct. Cl. 1978)

(unpublished) (finding no taking where flooding would occur only at intervals of about

once every thirty years); Baird v. United States, 5 Cl. Ct. 324, 330 (1984) (finding no

taking where plaintiffs have only established damage due to "a unique occurrence that

grew out of unusual climatic conditions").

In sum, plaintiffs have failed to state a takings claim based on the damages caused by the May 2, 2011 actions of the government that resulted in the flooding of plaintiffs' property.  In Count I of their complaint, plaintiffs have alleged a tort, not a taking.[5] Accordingly, plaintiffs' takings claim based on the damage caused by the May 2, 2011 flood must be dismissed.

### 2. Plaintiffs Have Not Stated A Takings Claim Based on the Floodway Operation Plan Itself

Plaintiffs next allege in Count II of their Amended Complaint that the current Floodway operation plan itself gives rise to a takings claim.  Count II alleges in part that the current Floodway operation plan, operated at the Corps discretion, "subjects the property owned by [plaintiffs] to inevitably recurring flooding."  Am. Compl. ¶¶ 85-86. Plaintiffs further allege that under the current operation plan, the damage to, destruction of, and devaluation of plaintiffs' property is greater than it would have been under earlier plans because the earlier plans imposed greater limitations on where the frontline levee could be breached.  Id. ¶ 63.

---

[5] The Claims Court has recognized that although both personal and real property are within the protection of the Fifth Amendment, in flooding cases, no taking occurs until the government has taken a flowage easement for the underlying property as well.  See Barnes, 538 F.2d at 874 ("At best, crop damages sustained prior to the date of taking mentioned above are the product of tortious invasions—mere trespasses."); Bryant, 1978 WL 23800, at *1 (applying the "inevitably recurring" standard to flooding damage of real property, improvements, trees, poultry, and equipment when government released flood waters from a dam due to severe and unusual rainstorms); Baird v. United States, 5 Cl. Ct. at 330-31 (finding "no taking of crops occurs until the government has taken a flowage easement for the underlying property as well") (citations omitted).  Therefore, the "inevitably recurring" standard applies to plaintiffs' personal property damages allegations as well.

The government again argues that plaintiffs have failed to allege sufficient facts to establish a taking.   First, the government argues that plaintiffs cannot state a takings claim based on the current operation plan because they do not allege that the damage to their properties caused by the plan exceeds the overall flood-protection benefits plaintiffs have received from the Project, nor do they allege that the current operation plan results in more frequent flooding than would have resulted absent government action.   The government also argues that plaintiffs' allegations that the current operation plan will cause more serious flooding and damage, as opposed to more frequent flooding, does not state a takings claim.   Because, the government argues, plaintiffs do not allege any specific facts which, if proven true, would demonstrate that there will be more frequent flooding under the current Floodway operation plan than would have occurred before it was changed, plaintiffs have failed to state a claim for a Fifth Amendment taking based on the current operation plan.

The court agrees with the government that plaintiffs have not alleged sufficient facts to establish a takings claim based on the current Floodway operation plan.   First, to state a claim based on the current operation plan, the court agrees with the government that the plaintiffs had to have alleged that the current operation plan will result in a greater number of floods than would have existed had the plan not been changed.   United States v. Sponenbarger, 308 U.S. at 265.   The Supreme Court in Sponenbarger made clear that, where the plan is part of a flood protection project, the plaintiff must allege facts to show that the flooding authorized by the plan exceeds the flooding that would have occurred before the plan was changed.   Id. at 265-66 ("An undertaking by the

Government to reduce the menace from flood damages which were inevitable but for the Government's work does not constitute the Government a taker of all lands not fully and wholly protected. . . . The Government has not subjected respondent's land to any additional flooding, above what would occur if the Government had not acted; and the Fifth Amendment does not make the Government an insurer that the evil of floods be stamped out universally before the evil can be attacked at all."). Here, plaintiffs have not alleged any facts to suggest that there will be more frequent flooding than would have existed without the current operation plan.  The facts set forth in the Amended Complaint reveal that the current plan has resulted in only one flood, the May 2, 2011 flood, and the Floodway itself has only been activated twice.  Plaintiffs' conjectural speculation regarding "intermittent and inevitably recurring" future flooding based on the existence of the current operation plan without any facts to support the claim is not enough to sufficiently allege more frequent flooding as required under Sponenbarger, 308 U.S. at 265.  See also Hartwig v. United States, 485 F.2d 615, 620 (Ct. Cl. 1973) ("Even if the court assumes . . . that [the government] caused the flood to be worse than it otherwise would have been, . . . this is not equivalent to contending that it is a continuing condition that will inevitably lead to future floods which would not otherwise occur.").

        In addition, even assuming that the government's May 2, 2011 activation of the Floodway caused a more damaging flood than the flood that would have occurred if the Floodway plan had not changed, allegations of more damaging flooding are not sufficient to state a takings claim.  Danforth, 308 U.S. at 286-87 (holding that construction of the Floodway setback levee did not amount to a taking by stating "[w]e cannot conclude that

the retention of water from unusual floods for a somewhat longer period or its increase in depth or destructiveness by reason of the setback levee, has the effect of taking"); Sponenbarger, 308 U.S. at 265 (no taking exists when flood control system merely "increase[s] . . . the volume or velocity of otherwise inevitably destructive floods"); see also Danforth v. United States, 105 F.2d at 320 ("The [1928 Flood Control Act] was obviously intended to provide for flowage easements in those cases where the operations of the Government will actually result in the hazard of a more frequent diversion of flood water from the river over the lands involved in the project."). Plaintiffs allege only more severe, not more frequent flooding, based on the current operation plan. These allegations are not sufficient to state a takings claim.[6]

### D. Plaintiffs Have Failed to State A Takings Claim Based on the Sand and Gravel Deposits Resulting from the May 2, 2011 Flood

Finally, in Count II of their Amended Complaint, plaintiffs allege the taking of flowage easements due to the sand and gravel deposited on plaintiffs' properties by the May 2, 2011 flood. Plaintiffs allege that, following the May 2, 2011 breach of the frontline levee, "deep sand and gravel deposits were left on the farmland," including in

---

[6] Although the court finds that plaintiffs have failed to state a claim because plaintiffs do not allege more frequent flooding than would have otherwise occurred based on the current operation plan, the court also notes that plaintiffs have also failed to allege any facts to address the "relative benefits" principle outlined in Sponenbarger, 308 U.S. at 265-67. Under this principle, unique to the flood control context, "no liability attaches if the Government's conduct bestowed more benefit than detriment on plaintiff's property." Laughlin v. United States, 22 Cl. Ct. 85, 111 (1990). Therefore, even if plaintiffs had alleged facts to show that the current plan will lead to frequent and inevitably recurring flooding over and above the flooding that would have occurred without the plan, plaintiffs cannot state a takings claim in connection with a flood control project without facts to show that the current plan results in more detriment than benefit to their land.

drainage ditches "that routinely and customarily serve to catch and divert excess water away from farmland." Am. Compl. ¶ 52. Plaintiffs further allege that these sand and gravel deposits inundated the drainage ditches, "subject[ing] the Floodway to intermittent and recurring flooding from low-level rain, storm, and other events that would not cause flooding in the normal course absent Defendant's actions and the resulting deposits." Id. Plaintiffs argue that these allegations are sufficient to state a takings claim.

Although plaintiffs' Count II specifically alleges "intermittent and inevitably recurring flooding" by virtue of these deposits, the government argues that plaintiffs have failed to state a claim because the deposition of sand and gravel in the drainage ditches constitutes consequential damages for which the United States is not responsible in a takings action. The court agrees.

As discussed above, under Ridge Line, the flooding and injuries to plaintiffs' property caused by the May 2, 2011 flood "occup[y] the category of mere consequential injury, or tort." Barnes, 538 F.2d at 870. "Even where the effects of the government action are predictable, to constitute a taking, an invasion must appropriate a benefit to the government at the expense of the property owner, or at least preempt the owner[']s right to enjoy his property for an extended period of time, rather than merely inflict an injury that reduces its value." Ridge Line, 346 F.3d at 1356; see also Nat'l By-Products, 405 F.2d at 1273-74 ("The essential inquiry is whether the injury to the claimant's property is in the nature of a tortious invasion of his rights or rises to the magnitude of an appropriation of some interest in his property permanently to the use of the Government."). Here, plaintiffs allege that the sand and gravel deposits have

substantially damaged and devalued plaintiffs' property, and that these damages, in turn, cause frequent and inevitable flooding. Am. Compl. ¶¶ 52-53. However, while plaintiffs' land was certainly damaged by the May 2, 2011 flood, these damages, including the deposits of sand and gravel on plaintiffs' land and the alleged flooding attendant to these deposits, are consequential injuries, incidental to the single flood, and not an appropriation of property for the government's benefit. It is for this reason that this case is distinguishable from Cotton Land Co. v. United States, 75 F. Supp. 232, 233 (Ct. Cl. 1948), and Barnes v. United States, 538 F.2d at 871, which both involved flooding caused by government-induced sediment deposits.

In Cotton Land, the construction of a dam caused sediment to deposit in an upstream river, which, over time, raised the level of the river bottom until the river permanently flooded the plaintiff's land. 75 F. Supp. at 232-33. In Barnes, the government frequently released dammed waters onto the plaintiff's property to control the flow of the Missouri River and eliminate sediment that had been deposited from earlier dam operations. Barnes, 538 F.2d at 868-70. In both cases, the court held that the frequent or permanent flooding ultimately caused by the government-induced sediment deposits may result in a taking. Id. at 872; Cotton Land, 75 F. Supp. at 235.

Plaintiffs' takings claim based on the sand and gravel deposits are distinct from the takings claims in Cotton Land and Barnes for several reasons. First, in Cotton Land and Barnes, the sand and gravel deposits at issue were not damages caused by a single flooding event, but accrued over time because of the government's dam construction and operation. Moreover, in contrast to Cotton Land and Barnes, plaintiffs in this case have

not alleged that the sand and gravel deposits have irrevocably altered the character of plaintiffs' land or nearby waters.   As the government argues, the sand and gravel deposits on plaintiffs' land may be removed from plaintiffs' drainage ditches, allowing the alleged periodic flooding due to those deposits to cease.  Finally and significantly, in contrast to Cotton Land and Barnes, plaintiffs do not sufficiently allege, under Ridge Line's "appropriation" prong, that the sand and gravel deposits and the flooding caused by those deposits amount to a governmental invasion of plaintiffs' property that "appropriate[s] a benefit to the government at the expense of the property owner."  Ridge Line, 346 F.3d at 1356; see Barnes, 538 F.2d at 872 (citing Cotton Land, 75 F. Supp. at 233).  The presence of the sand and gravel deposits on plaintiffs' land, while a perhaps predictable result of the single flood event, does not appropriate a benefit to the government.  Rather, the sand and gravel deposits and attendant flooding are tortious "injur[ies] that reduce[] [the] value" of plaintiffs' farmland, but do not appropriate it for government use.  Ridge Line, 346 F.3d at 1356.  Plaintiffs' allegations based on the sand and gravel deposits, therefore, cannot serve as a basis for a takings claim.

It is for these reasons that the court agrees with the government that plaintiffs have alleged only a consequential damage due to the one-time May 2, 2011 flood, and not a taking, with regard to the alleged flooding associated with the sand and gravel deposited by the May 2, 2011 flood.[7]

---

[7] This is not to say, however, that plaintiffs are without a remedy with regard to these sand and gravel deposits.  As noted above, plaintiffs allege that certain landowners have rights under the easement agreements executed pursuant to the 1965 Flood Control Act. See supra note 1.  Under those easements, plaintiffs allege they are entitled to damages for "excessive deposits of sand

**IV.    Conclusion**

For the foregoing reasons, the government's motion to dismiss under RCFC 12(b)(6) Count I and Count II of plaintiffs' Second Amended Complaint, encompassing plaintiffs' takings claims, is **GRANTED**.  Pursuant to this court's April 25, 2012 order, ECF No. 34, the government shall respond to the remaining cause of action in plaintiffs' Second Amended Complaint by **June 1, 2012**.

**IT IS SO ORDERED.**

s/Nancy B. Firestone
NANCY B. FIRESTONE
Judge

---

and gravel upon the lands . . . as a direct result of the planned operation of the floodway."
Plaintiffs' claims for damages based on their easements have not been dismissed.