# In the United States Court of Federal Claims

No. 11-275L
(Filed: March 17, 2017)

| | |
|---|---|
| BIG OAK FARMS, INC., et al.,          ) | |
| ) | Fifth Amendment Taking Claims; |
| Plaintiffs,    ) | partial summary judgment; *United* |
| ) | *States v. Sponenbarger,* 308 U.S. 256 |
| v.    ) | (1939); *Danforth v. United States*, 308 |
| ) | U.S. 271(1939); the relative benefits |
| THE UNITED STATES,    ) | test in flooding cases; government's |
| ) | burden of proof. |
| Defendant.    ) | |
| ) | |

*J. Michael Ponder*, Cape Girardeau, MO, for plaintiff. *Benjamin Brown* and *Laura Alexander*, Washington, DC, of counsel.

*Sean C. Duffy*, U.S. Department of Justice, Environmental and Natural Resources Division, Washington, DC, with whom was *Jeffrey H. Wood*, Acting Assistant Attorney General, for defendant. *Shaun Pettigrew*, U.S. Department of Justice, Washington, DC, of counsel.

## OPINION

**FIRESTONE**, *Senior Judge.*

This inverse condemnation and breach of contract case is now before the court on the parties' cross motions for partial summary judgment pursuant to Rule 56 of the Rules of the Court of Federal Claims. The plaintiffs, Big Oak Farms, Inc. and twenty others, have filed suit on behalf of a proposed class of persons or entities that owned land or businesses in the Birds Point-New Madrid Floodway ("Floodway"). The Floodway is part

of the Mississippi River and Tributaries Project ("MR&T Project") which provides flood control protection to the lower Mississippi River. The Floodway is specifically designed to protect Cairo, Illinois and other upstream areas and areas adjacent to the Floodway. In May 2011, the United States Army Corps of Engineers ("Corps") activated the Floodway to prevent Cairo from flooding. As a result, levees were intentionally breached by the Corps and water came rushing into the Floodway. The plaintiffs allege that the Corps' decision to activate the Floodway and inundate their property gave rise to a Fifth Amendment Taking of either temporary or permanent flowage easements by inverse condemnation.

Plaintiffs' inverse condemnation claims are complicated by the fact that the United States acquired perpetual flowage easements by condemnation or purchase over much of the 130,000 acres of land that make up the Floodway.[1] Plaintiffs with tracts of land encumbered by these flowage easements also allege that the government breached the terms of the easements. These plaintiffs claim that the Corps' actions resulted in broader flooding than authorized and that the Corps has failed to address the damage to property caused by activation of the Floodway as required by the terms of the easements. The plaintiffs' easement claims are not at issue in the pending cross motions.

The government had initially moved to dismiss plaintiffs' taking claims in this case for failure to state a claim under RCFC 12(b)(6). The government argued that the

---

[1] As discussed later, the United States did not acquire easements over approximately 20,000 remaining acres in the Floodway because, the United States asserts, these acres of land would flood whether or not the Corps activated the Floodway.

decision to activate the Floodway in order to protect upstream areas from flooding caused a temporary single flood which sounded in tort and could not give rise to a taking claim. The government argued that to establish a taking under then-existing Supreme Court and Federal Circuit precedent plaintiffs needed to allege that the government had either permanently taken their land by flooding or show that flooding from operation of the Floodway was inevitably recurring. The court determined that plaintiffs had failed to include the required allegations in their complaint and on May 4, 2012, issued an opinion granting the government's motion to dismiss plaintiffs' inverse condemnation claims on the grounds that they had not alleged that the flooding caused by activation of the Floodway was permanent or inevitably recurring.  As such, the court concluded that plaintiffs' claims were properly characterized as tort claims which this court cannot hear. *Big Oak Farms, Inc. v. United States*, 105 Fed. Cl. 48 (2012) ("*Big Oak*").[2]

Shortly after the court issued its opinion, the Supreme Court in *Arkansas Game & Fish Commission v. United States*, 133 S.Ct. 511 (2012), declined to adopt a per se rule that "permanently or inevitably recurring" flooding is needed to establish an inverse condemnation taking of land by flooding. *Id*. at 517.  In response to the decision in *Arkansas Game & Fish*, this court reinstated plaintiffs' taking claims.[3] The parties then began discovery to address whether two other Supreme Court decisions, *United States v.*

---

[2] The decision left in place plaintiffs' claims arising under the flowage easements. *Big Oak,* 105 Fed. Cl. at 50.

[3] *See* Order reinstating plaintiffs' taking claims and denying motion for certification for interlocutory appeal, ECF No. 61.

*Sponenbarger,* 308 U.S. 256 (1939) and *Danforth v. United States*, 308 U.S. 271 (1939),

bar plaintiffs' taking claims.  In *Sponenbarger,* the Supreme Court held that plaintiffs

could not establish a taking by inverse condemnation if "the Government has not

subjected respondent's land to any additional flooding above what would occur if the

Government had not acted. . . ." 308 U.S. at 266. The Supreme Court further set forth a

relative benefits test which espouses that even if the government action results in greater

flooding, "if Governmental activities inflict slight damage upon land in one respect and

actually confer great benefits when measured in the whole, to compensate the landowner

further would be to grant him a special bounty. Such activities in substance take nothing

from the landowner." *Id.* at 266-267.[4] In *Danforth,* a case from the same period and

involving the Birds Point-New Madrid Floodway at issue in this case, the Supreme Court

held that where plaintiffs' property would have been flooded before additional waters

were diverted through the Floodway, there is no taking unless the United States puts upon

a plaintiff's tract "a burden actually experienced, of caring for floods greater than it bore

prior to construction" of the flood control project. 308 U.S. at 286. The Supreme Court

further held with regard to the construction of set-back levees that any increased depth of

flood waters remaining on the property due to construction of the levees would not

[4] As the Supreme Court stated, "Enforcement of a broad flood control program does not involve
a taking merely because it will result in an increase in the volume or velocity of otherwise
inevitably destructive floods where the program, measured in its entirety greatly reduces the
general flood hazards, and is highly beneficial to a particular tract of land. . . . While this Court
has found a taking when the Government directly subjected land to permanent intermittent floods
to an owner's damage, it has never held that the Government takes an owner's land by a flood
program that does little injury in comparison with far greater benefits conferred."  *Id.* at 266-67.

constitute a taking. *Id* at 286 ("We cannot conclude that the retention of water from unusual floods for a somewhat longer period or its increase in depth or destructiveness by reason of the set-back levee, has the effect of taking.").

Pursuant to the court's Scheduling Order (ECF No. 94), as updated on March 3, 2016 (ECF No. 96), the parties have completed discovery on the *Sponenbarger* and *Danforth* issues and have submitted a joint statement of stipulated facts together with cross motions for partial summary judgment with additional evidentiary materials. Oral argument on the cross-motions was held on February 1, 2017.

For the reasons set forth below, the court finds that partial summary judgment is premature in that the issues raised by *Sponenbarger* and *Danforth* cannot be resolved based on the stipulated facts presented by the parties or with the additional evidence presented by the government. First, the record provided does not give the court sufficient facts to resolve in the first instance whether individual plaintiffs suffered more property damage from activation of the Floodway than each would have suffered without its operation. Second, the court does not have the evidence needed to determine, assuming damage to an individual property is greater than what the property would have experienced without activation of the Floodway, that the damage is slight when compared to the benefits the property received from operation of the MR&T Project as whole and that those benefits to the property offset the damage caused by operation of the Floodway in 2011.

The court holds that it is plaintiffs' burden to show that the MR&T Project and activation of the Floodway caused additional flooding beyond what would have occurred

under the same conditions had the government not constructed the MR&T Project or activated the Floodway. The court further holds that to the extent the government contends that the benefits of the MR&T Project to each tract of land "on the whole" offsets the damages suffered to the individual tract under the relative benefits test provided for in *Sponenbarger,* the burden will be on the government to make that case. Because *Danforth* essentially reiterates the standards set forth in *Sponenbarger,* it does not require the parties to present different proof.

In this connection, the court rejects the plaintiffs' contention that the relative benefits test set in *Sponenbarger* is no longer relevant to the issue of taking liability but is relevant only with regard to just compensation. As discussed *infra*, *Sponenbarger's* relative benefits tests is a government defense to finding liability for a taking. The court may choose to consider the *Sponenbarger* relative benefits defense separate from proceedings on the plaintiffs' liability case in chief for case management purposes. However, if at the end of the entire case, the plaintiffs have met their causation burden it will be up to the government to prove that the harm to each plaintiff's tract was slight when compared to the benefits the tract received from the flood control project as a whole and that those benefits outweigh the damage occasioned by activating the Floodway in 2011, in order to avoid liability for a taking.

The court further finds that before it can make any finding of liability, it must take into account the flowage easements covering the majority of tracts in the Floodway. Because plaintiffs are claiming rights under the flowage easements and will have to show, at least with regard to many tracts, that activation of the Floodway caused flooding

that exceeded or changed the character of the flooding authorized by those easements, the court cannot decide the government's taking liability without also determining whether the government is liable to compensate plaintiffs under the terms of those easements.

It is for all of these reasons, as discussed in greater detail below, that both the plaintiffs' and government's motions for partial summary judgment are **DENIED**.

## I.    FACTUAL BACKGROUND[5]

The Birds Point-New Madrid Floodway is located on the Missouri (west) side of the Mississippi River in Mississippi and New Madrid Counties, Missouri, just below the confluence of the Ohio and Mississippi Rivers. The Floodway is approximately 33 miles long and up to 10 miles wide. The Floodway contains approximately 130,000 acres (205 square miles) of land, which is used largely as farmland. There are two communities within the floodway: Dorena and Pinhook, which contain several churches, numerous large farm operations, and other assorted agricultural based businesses. Additionally, there are several hundred homes located in the Floodway.

The Floodway lies in the alluvial valley of the Mississippi River and some of the land within it would be subjected to periodic flooding, if not protected by levees or other flood protection measures. Before the Flood Control Act of 1928 was enacted, states,

---

[5] The parties have submitted a joint list of stipulated facts which the court draws from. Not all stipulated facts have been included in this section in order to enhance readability and because not all stipulated facts are necessary for the court to reach its decision at this time. Assertions made by defendant involving the use of affidavits have been noted and are not stipulated to by the parties.

localities, and individuals took measures to prevent flooding of land by the Mississippi River. These measures prevented some flooding that would otherwise have occurred.

Beginning in the early 1900's, local interests, with some oversight and funding from the Mississippi River Commission ("MRC"), constructed a continuous set of levees along the western side of the Mississippi River from Commerce, Missouri, to St. John's Bayou to provide protection to lands now within the Floodway from headwaters from the Mississippi River.

In 1927, the worst flood of record at that time occurred in the lower Mississippi River Valley. During the 1927 Flood, after overtopping the frontline levee, the Mississippi River crested at 56.4 feet on the Cairo gauge. In response to the 1927 flood, Congress passed the Flood Control Act of May 15, 1928 (the '28 Act), P.L. 70-391, authorizing the Mississippi River and Tributaries (MR&T) Project to provide flood control for the lower Mississippi Valley. The Flood Control Act of 1928 provides in part that: "The United States shall provide flowage rights for additional destructive flood waters that will pass by reason of diversions from the main channel of the Mississippi River: *Provided*, That in all cases where the execution of the flood control plan herein adopted results in benefits to property such benefits shall be taken into consideration by way of reducing the amount of compensation to be paid." 33 U.S.C. § 702d. Enactment of the Flood Control Act of 1928 resulted in some local flood control measures being incorporated in federally-controlled flood control measures. The Flood Control Act of 1928 provided for construction of the Birds Point-New Madrid Floodway as a component of the MR&T Project.

The purpose of the Floodway is to reduce increases in river stages upstream and adjacent to the Floodway during major flood events by diverting flood waters into and through the Floodway by expanding the western overbank area thereby lowering flood water levels on the main channel of the Mississippi River adjacent to and upstream of the Floodway, preventing overtopping of levees and floodwalls in those areas, and relieving stress on those flood control structures. The Floodway was designed to protect Cairo, Illinois and other areas upstream of and adjacent to the Floodway during major flood events and construction was completed in October of 1932.

The Floodway is enclosed by Mississippi River Project levees, comprised of the lower portion of the upper St. Francis levee (the frontline levee) on the eastern boundary, which has a 1,500 foot gap at the lower end that allows drainage into and backflow from the Mississippi River and the Birds Point-New Madrid levee (the setback levee), which forms the western boundary. The frontline levee consists of three parts: the upper fuseplug section, located below Birds Point, Missouri at the upper end of the Floodway (approximately 11 miles in length), the lower fuseplug section, located at the lower end of the Floodway above New Madrid, Missouri (approximately 5 miles in length) and the section between the two fuseplugs (approximately 38 miles in length).

For operation under the original plan, the United States acquired perpetual flowage easements by condemnation ("Original Flowage Easements") over much of the approximately 130,000 acres of land in the Floodway. Original Flowage Easements were not acquired over 20,088 acres of land (the "Matthews lands") that are below elevation 300 MSL. The Army Corps of Engineers projects that most of the lands in the floodway

9

below elevation 300 MSL were flooded by backwater from the Mississippi River at the time the floodway was activated in 2011.[6] The Floodway has only been utilized twice since its inception – in 1937 and in 2011. The Corps has obtained one new easement from a landowner in the Floodway since 1981. The new easement has the same language as the pre-1981 modified flowage easements.

The 1965 Flood Control Act and the 1986 Operations Plan controlled the operations of the Floodway in 2011. In the spring of 2011, the Mississippi River reached a record flood stage of 61.72 feet at Cairo, Illinois, which was the height of the river at the time that the Floodway was operated. On April 22, 2011, the Army Corps' Great Lakes and Ohio River Division ("LRD") increased discharges through Kentucky and Barkley reservoirs, which cleared additional space to retain flows from the Tennessee and Cumberland Rivers. On April 27, 2011 or April 28, 2011, the Mississippi River surpassed 58 feet on the Cairo gauge. Accordingly, on April 28, 2011, the U.S. Army Corps of Engineers, LRD, began storing water in Kentucky and Barkley reservoirs, and other Cumberland and TVA reservoirs in order to hold back water long enough for the explosives to be loaded into the upper fuseplug pipes.

On April 30, the Mississippi River continued to rise, reaching 59.1 feet on the Cairo gage with a forecasted crest of 60.5 feet on May 3. At 6:00 PM on May 2, General Walsh from the Corps ordered the Floodway to be operated, the expected operation to

---

[6] Backwater flooding generally rises gradually over the land and often has less velocity than overbank flooding.

occur at approximately 9:00-11:00 PM that evening. At 10:00 PM on May 2, the Corps operation team crevassed approximately the 9,000 feet (11,099 feet is the designed Inflow Crevasse) of the Upper Fuseplug allowing floodwaters to spread into the 130,000 acre Floodway.

On May 3, 2011, at approximately 12:40 PM, the Corps artificially crevassed Inflow/Outflow #2 at the lower fuseplug. On May 5, 2011, at approximately 2:40 pm, the Corps artificially crevassed Inflow/Outflow #1, located between the fuseplugs. When the crevasse in the frontline levee outside the two fuseplugs was opened, most of the land within the Floodway was already under water. At the time of the Floodway operation in May 2011, part of the Floodway was covered by water from the Mississippi River backing up through the 1,500 foot gap at the southern end of the Floodway.

On June 3, flows ceased entering the Floodway at the Inflow/Crevasse. Water remained on some of the land in the Floodway from May 2, 2011 until mid-June, 2011. The 2011 activation of the Floodway displaced hundreds people and flooded their homes.

As noted above, there are no stipulated facts regarding the extent of flooding that would have occurred on plaintiffs' property if the Floodway had not been activated in 2011 or what incremental flooding, if any, occurred by virtue of activating the Floodway. Nor have the parties provided any facts regarding the benefits to each of the plaintiffs' tracts from construction and operation of the MR&T Project in order for the court to determine whether the damage to the tracts from any incremental flooding was slight and outweighed by the benefits received from the MR&T project.

The government has attached declarations to its motion for partial summary judgment setting forth the following basic facts: that prior to the breaching of the levees, much of the land within the Floodway was already flooded (estimated as 123 of the total 208 square miles of land within the Floodway), that without operation of the Floodway, the Mississippi River would have crested at 63 feet, and that had the Floodway not been operated, waters would have continued to overtop the levee and breached it in multiple locations. Defendants also allege that without the improvements made to the levees by the Corps in the 1900's,  the river would have crested above 56.4 feet on seven occasions between 1975 and 2010, and would have crested above 58 feet (the height of the 1927 levee) on four of those occasions. Plaintiffs disagree with the factual assertions made in these declarations, believing them to be improperly presented at this time in the litigation, and requesting discovery under RCFC 56(d)(1) in order to allow plaintiffs to properly respond.

## II.   LEGAL STANDARDS

Under RCFC 56(a), "summary judgment is appropriate 'when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *BASR P'ship v. United States*, 795 F.3d 1338, 1342 (Fed. Cir. 2015); see also *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, 106 S. Ct. 2505 (1986). A dispute is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. A fact is material if it could "affect the outcome of the suit under the governing law." *Id*. In determining whether a genuine issue of material fact exists, a court considers the evidence and resolves all doubts in the light

most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).  The fact that both parties move for summary judgment does not require the court to grant summary judgment for one side or the other. Rather, summary judgment in favor of either party is not warranted if the court finds that disputes remain as to material facts. *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390 (Fed. Cir. 1987).

## III.    DISCUSSION

### A.    The Court Does Not Have The Facts Necessary To Award Summary Judgment To Either Party Regarding *Sponenbarger.*

The government argues based on *Sponenbarger* that it is entitled to partial summary judgment on plaintiffs' inverse condemnation claims on the grounds that plaintiffs cannot demonstrate that the benefits received from operation of the MR&T Project as a whole have not outweighed the damage suffered from operation of the Floodway in 2011. Specifically, the government relies on the Supreme Court's statement that the Court "has never held that the Government takes an owner's land by a flood program that does little injury in comparison to far greater benefits conferred." 308 U.S. at 267. In support of its motion, the government relies on its expert affidavits (not the stipulated facts) to show that plaintiffs' lands would have flooded on many occasions but for the MR&T Project.[7] The government contends that the burden was on the plaintiffs to

---

[7] The government avers that from the time the floodway was completed in 1932 until 2010, the Mississippi River reached 40 feet on the Cairo gauge – the level at which the river floods in its natural state – in 71 of 78 years for a total of 3,748 days. Declaration of David Berretta, Ex. A.

show that the damage to their property caused by activation of the Floodway was not

"slight" in comparison to the benefits received from operation of the MR&T Project and

that the 2011 flooding was not outweighed by the benefits each plaintiff received from

the MR&T Project over the history of the Project.

The plaintiffs argue in response that following the Supreme Court's decision in

*Horne v. Department of Agriculture*, 135 S.Ct. 2419 (2015), *Sponenbarger* no longer

provides a defense to taking liability but is instead relevant only in determining just

compensation. Pl.'s Mot. at 15. Plaintiffs also argue that the relative benefits test

established in *Sponenbarger* is a defense to government taking liability and that the

government has failed to present sufficient facts to support its defense. Specifically,

plaintiffs argue that to the extent the relative benefits test in *Sponenbarger* bars

government takings liability, the government has not shown, based on the joint

stipulations or other evidence submitted, that the harm to plaintiffs' tracts was slight and

offset by the benefits the plaintiffs have received from the overall operation of the MR&T

Project. Plaintiffs further argue that the parties have not had discovery to challenge the

conclusions in the government's affidavits and that summary judgment on the relative

benefits defense must wait until discovery is complete.

To begin, the court addresses plaintiffs' contention that *Sponenbarger* is no longer

relevant to the issue of taking liability based on their reading of the recent Supreme Court

decision in *Horne*. At issue in *Horne* was the Agricultural Marketing Agreement Act of

1937 and whether plaintiff could defend against a penalty imposed under the program on

the grounds that the government's mandatory possession of raisins under that program

14

resulted in a physical taking of the plaintiff's raisins without just compensation. In upholding Horne's argument, the Supreme Court explained that the government's physical appropriation of the raisins gave rise to a physical taking claim and that the taking could be asserted as a defense to the penalty. In this connection, the Supreme Court rejected the government's argument that the case should be remanded to the lower courts to determine whether the benefits Horne received from the regulatory program provided him with more economic value than he would have received as "just compensation," for the raisins. The Supreme Court said that value from "general regulatory activity" cannot constitute just compensation for a specific physical taking, instead reiterating that just compensation "normally is to be measured by the market value of the property at the time of the taking." *Horne*, 135 S.Ct. at 2429 (internal quotations and citations omitted). The majority opinion cited *Sponenbarger* in a footnote discounting Justice Breyer's separate opinion that referenced *Sponenbarger* and argued that the majority should have considered the value Horne received from the government's raisin program in determining whether Horne will be entitled to anything more from the government as just compensation. *Id.* at 2434-35. The majority explained that just compensation was not at issue in *Sponenbarger*, stating that "the Court determined that in [*Sponenbarger*] there was no taking in the first place. . . ." *Id.* at 2432, FN *.

The court finds that nothing in *Horne* indicates that *Sponenbarger* is no longer good law in the context of allegations of taking by floodwaters. Put simply, there is nothing in *Horne* to suggest that the Supreme Court intended to overturn *Sponenbarger's* relative benefits test for deciding taking liability in flooding cases. As the *Horne* majority

recognizes in footnote *, *Sponenbarger* did not deal with the issue of just compensation but whether the government was liable for a taking based on flooding in the first instance. Thus, the majority rejected the relevance of *Sponenbarger* in determining just compensation for flooding cases. The court cannot ignore the differences between the raisin appropriation dictated under the raisin regulatory program at issue in *Horne* which the Supreme Court held was unquestionably a physical taking and the flooding at issue in *Sponenbarger* which the Supreme Court acknowledged may not involve a taking where the injury is slight in comparison to the overall protections provided to the tract by the flood control project. *Sponenbarger*, 308 U.S. at 67. ("[T]his court has . . . never held that the Government takes an owner's land by a flood program that does little injury in comparison with the far greater benefits conferred."). Flood control projects are not regulatory programs and involve different taking considerations as the Supreme Court recently outlined in *Arkansas Game & Fish.* Thus, the court finds that *Horne* did not alter the relative benefits test which was established in *Sponenbarger* and has been consistently followed by the Federal Circuit in flooding cases. *See Ark-Mo Farms, Inc. v. United States,* 530 F.2d 1384, 1386 (Ct. Cl. 1976); *Hartwig v. United States,* 485 F.2d 615, 621 (Ct. Cl. 1973); *Van Buren v. United States,* 697 F.2d 1058, 1062 (Fed. Cir. 1983).

With the continued viability of the *Sponenbarger* relative benefits test resolved, the court now turns to the question of burdens of proof established in *Sponenbarger.*  It is not disputed that plaintiffs have the initial burden to prove causation, meaning that plaintiffs must prove that the government's actions caused flooding beyond what would

have occurred under the same conditions had there been no MR&T Project, including activation of the Floodway. If the plaintiffs can show that activation of the Floodway resulted in flooding that exceeded the character of the flooding that would have occurred under the same conditions without the MR&T Project, they will prevail on establishing a possible taking unless the government is able to prove that the benefits of the MR&T Project to the given tract of land outweigh the damages suffered to the tract.[8]

This allocation of the burden of proof is consistent with the decisions of the Federal Circuit and this court to examine the issue. For example, in *Van Buren*, the City of Van Buren, Arkansas, filed suit against the government, acting though the Corps, for a taking of a subterranean flowage easement, based on damage to the city's sewer system from operation of a federal dam.  In that case, the government asserted that the substantial benefits the City of Van Buren received from the Corps project clearly outweighed the detriments and argued on appeal that the trial judge had erred by failing to consider this fact in determining whether a taking had occurred. *Id.* at 1061. The Federal Circuit, in rejecting the government's appeal, determined that the government had not met its burden of showing that the benefits outweighed the detriments and thus

---

[8] Additionally, the court will need to examine evidence as it relates to the factors announced in *Arkansas Game & Fish*. The Supreme Court noted that before finding liability for a temporary taking based on flooding the court will also need to examine: (i) the duration of the flooding; (ii) whether the invasion is intended or is the foreseeable result of authorized government action; (iii) the character of the land at issue and the owner's "reasonable investment-backed expectations" regarding the land's use; and (iv) the severity of the interference. *Ark. Game & Fish,* 133 S. Ct. at 522. Because the court must weigh these factors in order to determine whether a taking has occurred, it will be incumbent on both parties to present relevant evidence as to their respective positions.

the trial court's finding of a taking was affirmed. *Id.* at 1062. ("We remain unconvinced, notwithstanding the government's broad references to dam-related improvements which accrue to the public, such as erosion control, that Van Buren has, in the balance, lost nothing by the forced choice between its sewer system, as originally designed, and the benefits of the federal project. The benefits alleged by the government have neither offset nor rendered minimal the damage Van Buren suffered.").

This same view was recently expressed by this court in *Quebedeaux v. United States*, wherein the government argued that the plaintiffs' case should be dismissed because it failed to allege that the injures they suffered from the operation of the [floodway] exceeded the benefits conferred on them by the federal flood control system. 112 Fed. Cl. 317, 320 (Fed. Cl. 2013). The court rejected this argument, noting that a party pleading a taking does not have to address every facet of its claim, including "likely defenses." *Id.* at 321. Indeed, contrary to the government's contentions, the courts in applying the relative benefits test have consistently put the burden of proof on the government. *See Ark-Mo Farms,* 530 F.2d at 1386; *Laughlin v. United States*, 22 Cl. Ct. 85, 114 (Cl. Ct. 1990) (noting evidence proffered by defendant's expert that "[w]ithout the dams, reservoirs, and levees, plaintiff's land would be at risk of surface water flooding every spring" and that "[w]ith the construction of the flood control system, such possibilities no longer are a hazard to the land plaintiff farms.").

The government contends that it should not bear the burden of proof regarding relative benefits because *Sponenbarger* does not provide an affirmative defense but instead is a "negative" defense which bars liability. Def.'s Supp. Brief at 3. The court

18

disagrees with this assertion. Rather, the court finds that the relative benefits test is a textbook example of an affirmative defense, defined in defendant's own brief as "a defense that does not negate the elements of the plaintiff's claim, but instead precludes liability even if all of the elements of the plaintiff's claim are proven." *Id.* at 1 (citations omitted). Showing that the benefits to plaintiffs' tracts from years of flood protection more than offset the damage to each tract from activating the Floodway certainly does not negate an element of plaintiffs' claim. Rather it is a defense to liability in the event plaintiffs have established a prima facie taking claim.

Having concluded that the burden is on plaintiffs to establish causation in the first instance and then on the government to show that the relative benefits plaintiffs received precludes a taking finding under *Sponenbarger,* the court finds that it does not have sufficient facts to rule on either issue. The application of *Sponenbarger* is, by necessity, a factually-intensive exercise, and at this point in the litigation before discovery on damage to each property is complete, the parties have not been able to provide (or agree to) enough facts to make any findings regarding whether plaintiffs experienced flooding greater than they would have experienced without the MR&T Project. Similarly, the generic evidence offered by the government regarding additional flooding absent the MR&T Project is not sufficient to prove that the benefits each tract has received from the MR&T Project has more than offset the damage caused by the flooding in 2011.

**B.      The Government Liability For A Taking Must Be Considered Together With Plaintiffs' Easement Claims.**

As noted, resolution of plaintiffs' taking claims is further complicated by the existence of the flowage easements owned by the government. The flowage easements will have to factor into the court's consideration of plaintiffs' taking claims under *Arkansas Game & Fish*. Similarly, the flowage easements must be considered in evaluating a *Sponenbarger* defense.  Specifically, if plaintiffs were entitled to compensation for property damage under the government's flowage easements, which were obtained as part of the MR&T Project, the court will have to decide how the right to reclamation of plaintiffs' property factors into the relative benefits test set in *Sponenbarger*.  In short, the court cannot resolve plaintiffs' inverse condemnation claims without also deciding the scope and limits of the flowage easements.

## IV.     CONCLUSION

For all of the above reasons, both plaintiffs' and defendant's motions for summary judgment are **DENIED**. The parties are to confer and shall file a joint status report with a proposed schedule for completing fact and expert discovery for all taking liability issues, by **April 7, 2017**. The court will also schedule a status conference for **April 17, 2017** to discuss the proposed discovery schedule and any other matters identified in the joint status report.

**IT IS SO ORDERED.**

                                        s/Nancy B. Firestone
                                        NANCY B. FIRESTONE
                                        Senior Judge

20